QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Sean S. Pak (Bar No. 219032)
   seanpak@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:   (415) 875-6600
Facsimile:   (415) 875-6700

QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Robert M. Schwartz (Bar No. 117166)
   robertschwartz@quinnemanuel.com
   Lance L. Yang (Bar No. 260705)
   lanceyang@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Ron Hagiz (*pro hac vice forthcoming*)
   ronhagiz@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Attorneys for Plaintiff Skillz Platform Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKILLZ PLATFORM INC., a Delaware corporation, | Case No.:_____ |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| AVIAGAMES INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Skillz Platform Inc. ("Skillz" or "Plaintiff") hereby asserts the following claims for patent infringement against Defendant AviaGames Inc. ("AviaGames" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.      Most patent infringement cases involve someone who inadvertently trespassed on someone else's invention, followed by a dispute about who got there first.  This is not one of those cases.  Instead, it is a case where Defendant AviaGames set out, seemingly from the get-go, to steal Skillz's highly valuable intellectual property in the form of copyrights and patents.  This lawsuit focuses on two of Skillz's foundational patents that AviaGames has indisputably infringed.

2.      Skillz is a pioneer in competitive mobile gaming, founded on the simple belief that people love to compete.  In 2012, Skillz developed innovative technologies to invent a new kind of mobile gaming platform (the "Skillz Platform").  The Skillz Platform facilitates two important things.  First, it connects millions of players across the country in meaningful, fun, and—most importantly— fair competition.  Second, it enables thousands of independent mobile game developers to transform new and existing games into skill-based competitions that have proven extremely profitable for game developers and players alike. Leveraging its patented technology and collaborative business model, Skillz now hosts **billions** of casual eSports tournaments for **millions** of mobile players worldwide, offering **$100 million** in prizes each month.

3.      To help game developers enable social competition in their games and take advantage of the Skillz Platform, Skillz provides a free Software Development Kit ("SDK") through a portal on its website (the "Developer Portal").  The Skillz SDK includes, among other things, built-in, patented functionality that provides pseudo-random number generation that developers are required to use when they need a random number seed for their game.  This feature ensures that players in

COMPLAINT FOR PATENT INFRINGEMENT

head-to-head competition are playing under identical, yet random, conditions and is critical to the fairness of every game played on the Skillz Platform.

4.      In 2016, AviaGames met with Skillz and said it was interested in building a game for the Skillz Platform.  It signed up to become a Skillz customer and began receiving additional tools, creative support, market data, and technical know-how beyond what Skillz offers free of charge through its Developer Portal. Through this supposed "collaboration," AviaGames gained intimate knowledge of the Skillz Platform.

5.      AviaGames then created a copycat platform called Pocket7Games and used it to launch knockoff versions of some of the most popular games on the Skillz Platform.  AviaGames even began promoting the Pocket7Games app using marketing assets that Skillz provided after AviaGames asked for help promoting the only game it did create for the Skillz Platform.  That game, which flopped, appears to have been a mere decoy designed to facilitate AviaGames's access to valuable information about Skillz's technology and business.

6.      AviaGames then went on to create and release standalone games independent of its Pocket7Games app, including games titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz".

7.      Through these standalone games and the Pocket7Games platform, AviaGames now competes directly with Skillz, as well as the independent developers whose games AviaGames has slavishly copied.

8.      It may turn out that AviaGames's infringement was less deliberate than it appears—that AviaGames simply absorbed the keys to Skillz's success and then used those keys to its advantage without even knowing it.

9.      But something more sinister may have happened.  Discovery in this case may establish that AviaGames planned from the get-go to merely "pose" as a mobile developer interested in launching a game on the Skillz platform, bait Skillz into divulging the ins and outs of its technology and business, and use this valuable

1   information to deliberately infringe Skillz's intellectual property and profit from

2   Skillz's innovation and drive.

3        10.    AviaGames's internal documents and the depositions of its key

4   personnel will tell whether its infringement was innocent or not.  AviaGames may

5   have intended to deceive Skillz from the moment the parties first met in 2016.

6   Under the patent laws of the United States, however, it makes no difference.  What

7   matters is that AviaGames is profiting from Skillz's patented technology.  And that

8   it must stop.

9        11.    Skillz welcomes fair competition.  But Skillz cannot—and will not—

10  tolerate theft.  Skillz brings this action to protect its innovative technology, and to

11  hold AviaGames accountable for its infringement of the patents that teach it.

12                       **THE PARTIES**

13       12.    Skillz is a Delaware corporation with its principal place of business at

14  321 NW Glisan Street, Suite 510, Portland, Oregon 97209.  Skillz is the owner of

15  the intellectual property rights at issue in this action.  Skillz's innovative technology

16  has enabled thousands of independent video game developers to create thriving

17  businesses developing skill-based video games that provide millions of gamers with

18  access to fair, fun, and meaningful competition.  Because of Skillz, video gamers

19  can now compete and profit from their skill and dedication.

20       13.    On information and belief, AviaGames is a Delaware corporation with

21  a principal place of business at 2586 Wyandotte Street, Unit 2B, Mountain View,

22  California 94043.  On information and belief, AviaGames markets, offers, and

23  distributes applications and services such as the Pocket7Games application and

24  standalone game applications throughout the United States, including in this

25  District.

26       14.    Upon information and belief, AviaGames directly and/or indirectly

27  develops, designs, manufactures, distributes, markets, offers to sell and/or sells

28  infringing products and services in the United States, including in this District, and

otherwise purposefully directs infringing activities to this District in connection with the Pocket7Games application and standalone game applications.

### JURISDICTION & VENUE

15.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

16.     This Court has subject-matter jurisdiction over the matters asserted herein under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq*.

17.     This Court has personal jurisdiction over AviaGames, in part because AviaGames does continuous and systematic business in this District, including by providing infringing products and services to the residents of this District that it knew would be used within this District, and by soliciting business from the residents of this District.  For example, AviaGames is subject to personal jurisdiction in this Court because, among other reasons, upon information and belief, it has a regular and established place of business at its offices in this District, including its office in Mountain View, and directly and through agents regularly does, solicits and transacts business in the Northern District of California and elsewhere in the State of California, including through its website at www.pocket7games.com, as well as its Pocket7Games application and standalone game applications, all of which are marketed, offered, distributed to, and utilized by users of mobile devices in this District and throughout the State of California.

18.     In particular, AviaGames has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, sold, and/or imported infringing products and services in the State of California, including in this District, and engaged in infringing conduct within and directed at or from this District.  For example, AviaGames has purposefully and voluntarily placed the Pocket7Games application and standalone game applications into the stream of commerce with the expectation that its infringing products and services will be used in this District.  The infringing

Pocket7Games application and standalone game applications have been and continue to be distributed to and used in this District.  AviaGames's acts cause injury to Skillz, including within this District.

19.    Venue is proper in this District under the provisions of 28 U.S.C. §§ 1391 and 1400(b) at least because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because AviaGames has committed acts of infringement in this District and has a regular and established place of business in this District.

20.    In particular, on information and belief, AviaGames has a regular and established place of business in this District located in Mountain View, California. On further information and belief, AviaGames employs engineers and/or other personnel within this District, including at its office in Mountain View.[1]

## INTRADISTRICT ASSIGNMENT

21.    On information and belief, a substantial part of the events giving rise to the claims alleged in this Complaint occurred in the County of Santa Clara.  For purposes of intradistrict assignment under Civil Local Rules 3-2(c) and 3-5(b), this Intellectual Property Action will be assigned on a districtwide basis.

## FACTUAL ALLEGATIONS

### I.    SKILLZ'S INNOVATION GIVES BIRTH TO A THRIVING NEW INDUSTRY

22.    Skillz was founded in October 2012 in Boston, Massachusetts.

23.    At that time, despite the popularity of video games in modern society, video gamers had limited to no options to compete and profit from their skill and dedication in the same way that athletes in many physical sports could.  While

---

[1]  For example, www.linkedin.com identifies AviaGames's founder and CEO, Vickie Chen, and AviaGames's co-founder and VP of Marketing, Ping Wang, as being located in Mountain View, California.  (*See* Exs. C & D.)  In addition, as of the date of this filing, AviaGames's LinkedIn page includes a job posting for a full-time position in the "San Francisco bay area."  (*See* Ex. E.)

athletes in physical sports could earn millions of dollars through competition—not to mention recognition, respect, endorsements, and countless other opportunities—the technology to afford video gamers similar opportunities hadn't yet been developed.  Andrew Paradise and Casey Chafkin founded Skillz to change that. Skillz now offers more than $100 million in prizes each month.

24.     Skillz makes a mobile eSports platform.  Rather than hoard its technology, Skillz opened the platform to third-party game developers to maximize the impact and reach of its innovation.

25.     The Skillz Platform helps developers build successful franchises by enabling social competition in their games.  Not only that, it aligns the interests of developers and gamers with respect to user monetization.  Whereas traditional mobile games monetize user engagement through in-game advertisements or purchases, the Skillz Platform allows developers to monetize user engagement primarily through prizes and competition.  This dynamic generates significantly stronger monetization for developers while delivering gaming experiences that players trust and love.  In turn, Skillz receives a percentage of player entry fees in paid contests.

26.     To enable game developers to make their games available on the Skillz Platform, Skillz developed a Software Development Kit ("SDK") that allows developers to integrate eSports functionality and social competition into new or existing mobile games.  Using Skillz's SDK, which Skillz makes available through a portal on its website, game developers can create or modify their own video games to be fun, fair, and competitive experiences.

27.     Competitive gaming has proven to improve player retention, enhance gameplay, boost app store reviews, increase player engagement, and lengthen gameplay sessions—all of which helps game developers better monetize their content.  Thus, integrating Skillz's patented technology has proven extremely valuable to game developers, in addition to the users that play these games.

28.     To create the Skillz Platform, Skillz developed several groundbreaking technologies, including the two patents that are the subject of this action.

29.     First, to guarantee the fairness and integrity of every competition on the Skillz Platform, Skillz developed a technology that allows gameplay to be the same for competitors within an online digital game competition, while also allowing games to be different across different competitions.  By assigning each competition a unique match identifier and using pseudo-random number seeds that are characterized by that unique match identifier, the elements of each game can be the same for the participants in one competition while maintaining the unpredictable nature of each game that is critical to competitive gaming.  This novel technology allows competitions to be skill-based even when the games have random elements associated with them, such as the starting hand and deck in a head-to-head game of solitaire.  Game developers are instructed on how to access this technology through the Skillz SDK so that their games can offer head-to-head competitions where gamers experience identical, yet still unpredictable, conditions.  Skillz has been awarded multiple patents relating to this technology, including U.S. Patent No. 9,649,564 ("the '564 Patent").[2]

30.     In addition, to ensure that players could compete for cash in compliance with restrictions against cash-based competitions in certain states—and that players could be discouraged from cheating given the real-money stakes— Skillz developed technology that allows only players in states that allow cash-based competitions to play for real money, and creates an electronic record of their in-game actions as an anti-cheating measure.  By requiring players' client devices, *e.g.*, mobile phones, to provide GPS information before participating in an online cash-based digital game competition, cash-based competitions can be provided to users anywhere those competitions are permitted.  And, by maintaining electronic records

_____

[2]  The '564 Patent is attached as Exhibit B.

of each competitor's in-game actions that are also made available to other competitors, the possibility of cheating can be effectively minimized.  Skillz claimed this invention in U.S. Patent No. 9,479,602 ("the '602 Patent").[3]

31.     The '564 and '602 Patents are fundamental to the innovation that Skillz brought to the mobile gaming industry.  Using these technologies, Skillz enables video game developers to create skill-based mobile video games for the Skillz Platform in which users can compete with one another to earn hundreds, thousands, or even millions of dollars.

## II.     LED BY SKILLZ, THE "ESPORTS" INDUSTRY EXPLODES

32.     Fueled in part by Skillz's revolutionizing technology and collaborative business model, the eSports industry exploded, and Skillz became one of the fastest growing companies in the United States.

33.     Although Skillz did not coin the term "eSports" or invent the concept of mobile gaming or competitive video games, Skillz's technology and drive has had an enormous impact on these industries and has helped launch eSports into the mainstream.  Though Skillz's impact cannot be quantified in numbers alone, the numbers themselves are staggering.

34.     The first Skillz-powered gaming app went live in April 2013.  By July 2014, Skillz had paid out over $1 million in cumulative prize money.  By June 2015, that number had increased to $10 million.  In December 2015, it reached $20 million.

35.     In January 2016, Skillz launched cross-platform multiplayer technology allowing Android and iOS users to play in the same competitive video game tournaments.  That year, Skillz accounted for 46% of *all* eSports prizes awarded.

---

[3]  The '602 Patent is attached as Exhibit A.

36.     In May 2017, Skillz became the first eSports company to appear on CNBC's "Disruptor 50" list after it doubled its revenue run-rate to over $100 million in eight months.

37.     In August 2017, Skillz was named the fastest growing private company in America by *Inc.* magazine, with three-year revenue growth of over 50,000%.

38.     By October 2017, just four years after its founding, Skillz had over 6,000 independent developers signed up to create games and eSports for the Skillz Platform.

39.     In November 2017, Skillz launched multi-app chat technology, allowing more than 2,500 apps on the Skillz Platform to connect 12 million users through chat.

40.     Today, the Skillz Platform has over 40 million registered users and hosts an average of over 5 million daily tournaments, including 1.5 million paid entry daily tournaments, offering over ***$100 million*** in prizes each month.

41.     And, contrary to certain stereotypes about competitive sports and video gamers, more than half of Skillz's 40 million players are women.  In 2018, the top ten gamers on the Skillz Platform received $8 million in prize money.  Seven of those competitors were women—including a user named Kmamba1090, who received $1,418,508 in prize money that year, and a user named jpark87, an engineering student whose $627,191 in prize money helped her pay for college.

42.     In the wake of Skillz's revolutionary advancements, mobile gaming has attracted billions of dollars of investment from traditional sports teams and leagues, professional athletes, pop stars, private equity, media moguls, Fortune 100 corporations, and a diverse array of game publishers.

43.     Skillz's meteoric rise has fueled the growth of an industry whose market size already eclipses music, movies, and television.

44.     Yet Skillz is not alone in its success, nor did it set out to be.  Skillz's mission today is the same as it has been from the start: to enable independent mobile

game developers to create thriving businesses while providing gamers everywhere with access to fair, fun, and meaningful competition.  By sharing its technology with game developers in this collaborative manner, Skillz has created opportunities for thousands of independent start-ups.  Skillz's technology provides the tools necessary for mom-and-pop development studios to compete with the largest and most sophisticated mobile game developers in the world.

**III.    AVIAGAMES TEAMS UP WITH SKILLZ TO DEVELOP A GAME FOR THE SKILLZ PLATFORM—OR SO IT SAYS**

45.    In 2016, AviaGames began inquiring about the Skillz Platform.

46.    Without Skillz's know-how and SDK, developers could spend years trying to overhaul their video games into eSport games.  The Skillz SDK enables developers to achieve that transformation in as little as a single day of development work.  This technology set is delivered to Skillz's game development community via Skillz's Developer Portal, which allows developers to monitor, integrate and update their games seamlessly.

47.    The ability to transform regular video games into competitive eSports has proven extremely valuable to independent game developers, allowing them to turn many of their games into revenue sources that reward both developers and users alike.

48.    In particular, Skillz's Tournament Management System ("TMS") drives revenue for game developers by enabling cash tournaments, increasing traffic, advertising revenue, and in-app purchases through virtual currency tournaments.  The Skillz TMS also improves game retention.  Competition makes games more social as players compete against each other in tournaments.  Scores become more meaningful as players get rewarded for their skills, which translates into more downloads, a higher number of daily active users, and longer gameplay sessions.

49.     While any game developer can make use of Skillz's SDK by going to www.Skillz.com, creating an account on the Skillz Developer Portal, and agreeing to Skillz's Online Developer Terms and Conditions of Service, developers who want additional assistance from Skillz can sign up to become a Skillz customer.

50.     AviaGames became a Skillz customer in 2016 so that it could benefit from Skillz's specialized knowledge and expertise.

51.     Shortly thereafter, AviaGames launched its first and only game on the Skillz Platform.  The game, which was called Number Drop, was not popular with users.

52.     Armed with the knowledge it learned from Skillz, AviaGames then launched additional games on platforms that competed *against* Skillz.  These additional games copied some of the most popular games that already existed on the Skillz Platform.

53.     Around this time, AviaGames also began building its own platform that used Skillz's patented technology.  That platform is known today as Pocket7Games. The Pocket7Games platform includes several games that are blatant copies of games already offered on the Skillz Platform.

54.     AviaGames later released several of these copycat games as standalone games, further infringing Skillz's inventions.

55.     AviaGames's wrongful appropriation of Skillz's technology and innovation continues to this day, allowing AviaGames to continue profiting off of the work of others.

56.     Skillz brings this action to protect its innovative technology, hold AviaGames accountable for its unlawful infringement, recoup the damages it has suffered—and the profits AviaGames has "earned"—as a result of AviaGames's misconduct.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,479,602

57.     Skillz incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

### The '602 Patent

58.     U.S. Patent No. 9,479,602 ("the '602 Patent") is entitled "Event platform for peer-to-peer digital gaming competition" and was issued on October 25, 2016.  A true and correct copy of the '602 Patent is attached as Exhibit A.

59.     The '602 Patent was filed on May 20, 2015, as U.S. Patent Application No. 14/717,621.

60.     Skillz is the owner of all rights, title, and interest in and to the '602 Patent, with the full and exclusive right to bring suit to enforce the '602 Patent, including the right to recover for past infringement.

61.     The '602 Patent is valid and enforceable under United States Patent Laws.

62.     At the time of the '602 Patent, it was not common or conventional to use a computing system to: (a) receive data identifying a peer-to-peer gaming event and comprising a request to register for the peer-to-peer gaming event from a remote client, the peer-to-peer event being a geographically restricted peer-to-peer gaming competition having a plurality of participants each playing a skill-based digital game, (b) associate the client with the peer-to-peer gaming event, (c) receive data characterizing a location of the client according to a geolocation system of the client, (d) compare the location of the client to a predefined geolocation of the peer-to-peer event to determine that the client satisfies a geographical location requirement of the peer-to-peer gaming event, and (e) cause provision of a skill-based digital game to the client during the peer-to-peer gaming event.

63.     The inventors of the '602 Patent realized that peer-to-peer gaming events in the context of electronic sports (also known as eSports or competitive gaming) presented a technological problem because such "events are generally

organized in an ad hoc manner," such that "games played by event participants often vary in difficulty (and therefore player outcome varies) because the game may present a different scenario each time the game is played," "mak[ing] it challenging to determine event competition winners or rankings in a fair manner." '602 Patent at 1:27-43.

64.     The inventors of the '602 Patent recognized that, when a remote client sought to participate in a peer-to-peer gaming event where the event is geographically restricted, receiving a request from that client, associating the client with the peer-to-peer gaming event, and receiving data characterizing a location of the client according to a geolocation system of the client could facilitate a comparison of the client's location to the peer-to-peer event's predefined geolocation so as to determine that the client satisfies a geographical location requirement and only then cause provision of a skill-based digital game to the client during the peer-to-peer gaming event.  As taught by the '602 Patent, "[e]vents can be location-based so that the event will take place at a specific geographical location, and systems are in place to only permit users who are at those geographical locations to participate in the event." '602 Patent at 7:24-27.  For example, peer-to-peer gaming events may be geographically restricted where such events involve cash games, including skill-based competitions, because different states have different laws regulating cash games (including skill-based competitions), making it necessary to impose geographic restrictions to comply with local laws and regulations.

65.     The '602 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of electronic sports.  The solution implemented by the '602 Patent provides a specific and substantial improvement over prior ad hoc methods used for this purpose, resulting in an improved method for facilitating fair, skill-based, geographically restricted peer-to-peer gaming events.  The '602 Patent achieves this result by introducing

novel elements such as, among other things, receiving data characterizing the client's location according to the client's geolocation system, wherein the geolocation system is a global positioning system (GPS) service or a local position system (LPS) utilizing beacons, and comparing that location to a predefined geolocation of the peer-to-peer event to determine that the client satisfies the event's geographical location and only then providing the skill-based digital game to the client during the peer-to-peer gaming event.  This solution is novel because, among other things, it makes it harder for users to trick the system to circumvent geographical restrictions.  For example, if restrictions were based on user profiles, a user could falsify his or her address; similarly, if restrictions were based on IP addresses, a user could spoof an IP address by using a proxy.  Relying on location systems that are independent of user input and provide location in real time, such as GPS or LPS, makes the geographical restrictions harder to circumvent.  This technological solution is particularly novel where the peer-to-peer competition includes a plurality of participants concurrently playing the skill-based digital game.

66.     The inventors of the '602 Patent also recognized that cheating was a potential problem in peer-to-peer gaming events.  As taught by the '602 Patent, "[v]ideo recordings can be streamed live and stored for all game entries which can later be verified for authenticity (e.g., anti-cheating)."  '602 Patent at 6:4-7.

67.     The '602 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of electronic sports.  The solution implemented by the '602 Patent provides a specific and substantial improvement over prior anti-cheating methods by generating an electronic record of the peer-to-peer gaming event.  The '602 Patent achieves this result by introducing novel elements such as, among other things, generating a video feed recording in-game actions by capturing an interface display space of the skill-based digital game and broadcasting the capture to peer-to-peer gaming platforms of one or more additional clients participating in the peer-to-peer event.

68.     The claims of the '602 Patent recite and embody Skillz's innovative, unconventional solution to the problems of enforcing geographic restrictions and anti-cheating controls.  For example, claim 1 recites "[a] method for implementation by at least one data processor forming part of at least one computing system, the method comprising: receiving, by at least one data processor, data identifying a peer-to-peer gaming event and comprising a request to register for the peer-to-peer gaming event, the request originating from peer-to-peer gaming platform software stored in memory of a client and executing on the client, the client being remote from the data least one data processor, the peer-to-peer event being a geographically restricted peer-to-peer gaming competition having a plurality of participants each playing a skill-based digital game; associating, using the at least one data processor, the client with the peer-to-peer gaming event; receiving data characterizing a location of the client according to a geolocation system of the client, wherein the geolocation system of the client is a global positioning system (GPS) service or a local positioning system (LPS) utilizing beacons; and comparing the location of the client to a predefined geolocation of the peer-to-peer event to determine, using the at least one data processor, that the client satisfies a geographical location requirement of the peer-to-peer gaming event; and causing, using the at least one data processor, provision of the skill-based digital game to the client during the peer-to-peer gaming event, the skill-based digital game exchanging game data with a game server remote from the at least one data processor and the client."  '602 Patent at claim 1.

69.     The '602 Patent further claims "[t]he method of claim 1, further comprising: generating, using the at least one data processor, a video feed recording in-game actions by, using the peer-to-peer gaming platform, capturing an interface display space of the skill-based digital game and broadcasting the capture to peer-to-peer gaming platforms of one or more additional clients participating in the peer-to-peer event."  '602 Patent at claim 3.

70.    The '602 Patent further claims "[t]he method of claim 1, wherein the peer-to-peer competition includes the plurality of participants concurrently playing the skill-based digital game."  '602 Patent at claim 9.

### '602 Patent Allegations

71.    AviaGames has infringed and is infringing, either literally or under the doctrine of equivalents, the '602 Patent in violation of 35 U.S.C. § 271 *et seq.*, directly by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems (hereinafter "the Accused Products") that infringe at least claims 1, 3, and 9 of the '602 Patent.  The Accused Products are non-limiting examples identified based on publicly available information, and Skillz reserves the right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

72.    On information and belief after reasonable investigation, the Accused Products include the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems.

73.    As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claims 1, 3, and 9 of the '602 Patent in connection with the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems.  This description is based on publicly available information.  Skillz reserves the right to modify this description including, for example, on the basis of information about the Accused Products that it obtains during discovery.

*1(a) A method for implementation by at least one data processor forming part of at least one computing system, the method comprising:* – AviaGames makes and/or uses the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems. Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the Accused Products, as the Accused Products perform a method for implementation by at least one data processor forming part of at least one computing system as further described below for the remaining claim limitations.

*1(b) receiving, by at least one data processor, data identifying a peer-to-peer gaming event and comprising a request to register for the peer-to-peer gaming event,* - For example, on information and belief, upon a user's selection of a tournament or cash game from the list of available peer-to-peer gaming events for a game available within the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", the at least one data processor in the Accused Products' backend servers and systems receives data identifying the peer-to-peer gaming event and comprising a request to register for that event from the user's device.



*1(c) the request originating from peer-to-peer gaming platform software stored in memory of a client and executing on the client,* - For example, on information and belief, the request originates from the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", constituting peer-to-peer gaming platform software, which is stored in memory of a client iOS mobile device and executes on that device.

*1(d) the client being remote from the data least one data processor,* - For example, on information and belief, the client iOS mobile device is remote from the

COMPLAINT FOR PATENT INFRINGEMENT

at least one data processor in the Accused Products' backend servers and systems. The Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", on the iOS mobile device must communicate with the remote at least one data processor through the Internet.



*1(e) the peer-to-peer event being a geographically restricted peer-to-peer gaming competition* - For example, on information and belief, all cash tournaments and cash games available in the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", are geographically restricted peer-to-peer gaming competitions.  Pay-to-play competitions where prizes are awarded are illegal in many states such that, to be in compliance with state gambling laws, Pocket7Games must determine that the player is not geographically located in any

1  such states before allowing the user to play in the cash tournament.  If location

2  services for the Pocket7Games application and standalone game applications,

3  including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold",

4  "Explodocube", and "Tile Blitz", are disabled on an iOS mobile device, a message

5  is generated by the application asking for access to the phone's location.  If location

6  access is declined by the user, then when the user presses the button to register for

7  any cash tournament, an identical message is displayed.  If location access is again

8  declined by the user, the user is not allowed to play in the selected cash tournament

9  or cash game.




COMPLAINT FOR PATENT INFRINGEMENT

1

2

3

4

5

6

7

*Cash games are not available in the following states: Arizona, Arkansas, Connecticut, Delaware, Louisiana, Montana, South Carolina, South Dakota, Tennessee, and Vermont. However, players in these states can still enjoy fun free games!

8    (Description of Pocket7Games in the Apple App Store.)

9

10    *1(f) having a plurality of participants each playing a skill-based digital game;*

11    - For example, on information and belief, Solitaire! is a skill-based digital game

available in the Pocket7Games application and standalone game applications,

12    including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold",

13    "Explodocube", and "Tile Blitz", which has a plurality of participants (two users)

14    playing against each other.  Upon information and belief, all games available in the

15    Pocket7Games application and standalone game applications, including applications

16    titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz",

17    are skill-based digital games that allow any user to compete against one or more

18    other participants.

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11




12
13
14
15
16
17
18
19
20
21
22
23
24

TONS OF FUN GAMES FOR REAL MONEY

Bingo Clash: Play classic Bingo games with fun buffs. Beat your opponent in fast-paced Bingo games and daub the numbers as quickly as possible to earn money in cash games.

Solitaire!: A fun new take on a classic card game. Test your Solitaire skill against opponents and make money at the same time.

21 Gold: A lightning-fast version of Blackjack. If you're a fan of math games, show off your skill in this classic casino card game.

(Description of Pocket7Games in the Apple App Store.)

25
26     *1(g) associating, using the at least one data processor, the client with the*
27 *peer-to-peer gaming event;* - For example, on information and belief, upon selection
28 of a peer-to-peer gaming event or tournament, the at least one data processor in the

-22-                    Case No. _____

Accused Products' backend servers and systems associates the client with the user's selected peer-to-peer gaming event.



*1(h) receiving data characterizing a location of the client according to a geolocation system of the client, -* For example, on information and belief, upon a user's selection of a cash tournament or cash game, the Accused Products' backend servers and systems receive data characterizing a location of the client iOS mobile device according to a geolocation system of the client such as the iOS location service.



COMPLAINT FOR PATENT INFRINGEMENT

1     *1(i) wherein the geolocation system of the client is a global positioning*

2 *system (GPS) service or a local* positioning *system (LPS) utilizing beacons; and -*

3 For example, on information and belief, the client iOS device's location service (its

4 geolocation system) is a global positioning system (GPS) service.



15     *1(j) comparing the location of the client to a predefined geolocation of the*

16 *peer-to-peer event to determine, using the at least one data processor, that the client*

17 *satisfies a geographical location requirement of the peer-to-peer gaming event; and*

18 *-* For example, on information and belief, upon a user's selection of a cash

19 tournament or cash game, the at least one data processor in the Accused Products'

20 backend servers and systems compare the location of the client iOS device to a

21 predefined geolocation of the peer-to-peer event to determine that the client satisfies

22 a geographical location requirement of the peer-to-peer gaming event, for example

23 so as to exclude states in which pay-to-play, cash-based competitions are illegal.

COMPLAINT FOR PATENT INFRINGEMENT

*1(k) causing, using the at least one data processor, provision of the skill-based digital game to the client during the peer-to-peer gaming event, -* For example, on information and belief, once it has been determined that the user is located in a state that allows cash-based competitions, the at least one data processor in the Accused Products' backend servers and systems causes provision of the selected skill-based digital game to the client during the selected peer-to-peer gaming event.



*1(l) the skill-based digital game exchanging game data with a game server remote from the at least one data processor and the client.* - For example, on information and belief, the skill-based digital game (such as Solitaire!) exchanges game data (such as the final scores of both competitors in a Solitaire! competition) with a game server remote from the at least one data processor in the Accused Products' backend servers and systems and the client iOS device.  Upon information and belief, conventional mobile game architectures use various types of remote servers to handle the different types of information provided to and used by the mobile game, such that the game server handling game data is remote from the servers handling client requests and location verification.



3. *The method of claim 1, further comprising: generating, using the at least one data processor, a video feed recording in-game actions by, using the peer-to-peer gaming platform, capturing an interface display space of the skill-based digital game and broadcasting the capture to peer-to-peer gaming platforms of one or more additional clients participating in the peer-to-peer event.* - On information and belief, as detailed above, the Accused Products perform the method of claim 1.  In addition, for example and on information and belief, the at least one data processor in the Accused Products' backend servers and systems generates a video feed recording in-game actions by, using the peer-to-peer gaming platform (the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz"), capturing an interface display space of the skill-based digital game (such as Solitaire!) and broadcasting the capture to peer-to-peer gaming platforms of one or

more additional clients participating in the peer-to-peer event (such as the second player in a Solitaire! competition).



9. *The method of claim 1, wherein the peer-to-peer competition includes the plurality of participants concurrently playing the skill-based digital game.* - On information and belief, as detailed above, the Accused Products perform the method of claim 1.  In addition, for example and on information and belief, the peer-to-peer competition (such as a Solitaire! competition) includes the plurality of participants (two players) concurrently playing the skill-based digital game (for example, when the two players are matched at the beginning of the competition and begin concurrently playing Solitaire!).

1
2
3
4
5
6
7
8
9
10
11
12



13    74.    On information and belief, AviaGames markets, offers, and distributes

14  the infringing Pocket7Games application and standalone game applications,

15  including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold",

16  "Explodocube", and "Tile Blitz", in and within the United States, including through

17  distribution platforms such as the Apple App Store as well as its own website,

18  www.pocket7games.com.

19    75.    On information and belief, the accused Pocket7Games application and

20  standalone game applications, including applications titled "Bingo Clash", "Solitaire

21  Clash", "21 Gold", "Explodocube", and "Tile Blitz", are the primary or only

22  products and services offered by AviaGames in the United States.

23    76.    On information and belief, AviaGames has also designed, developed,

24  tested, and used the infringing applications and services in and within the United

25  States.

26    77.    Skillz has been damaged by AviaGames's infringement of the '602

27  Patent and will continue to be damaged unless AviaGames is enjoined by this Court.

28  Skillz has suffered and continues to suffer irreparable injury for which there is no

-29-                                  Case No. _____

adequate remedy at law.  The balance of hardships favors Skillz, and public interest is not disserved by an injunction.

78.     Skillz is entitled to recover from AviaGames all damages that Skillz has sustained as a result of AviaGames's infringement of the '602 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 9,649,564

79.     Skillz incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

## The '564 Patent

80.     U.S. Patent No. 9,649,564 ("the '564 Patent") is entitled "Peer-to-peer wagering platform," and was issued on May 16, 2017.  A true and correct copy of the '564 Patent is attached as Exhibit B.

81.     The '564 Patent was filed on December 21, 2015, as U.S. Patent Application No. 14/976,569 and claims priority to, *inter alia*, U.S. Patent Application No. 13/569,424, filed on August 8, 2012.

82.     Skillz is the owner of all rights, title, and interest in and to the '564 Patent, with the full and exclusive right to bring suit to enforce the '564 Patent, including the right to recover for past infringement.

83.     The '564 Patent is valid and enforceable under United States Patent Laws.

84.     The transmission of pseudo-random numbers, characterized by a unique match identifier, to clients participating in an online digital gaming competition, and the use of those pseudo-random numbers to generate a common gameplay experience for a game of skill, especially one having random elements, was not well known in the art as of the priority date of the '564 Patent.

85.     The inventors of the '564 Patent recognized that an expansion of computer networks and a corresponding expansion of online digital gaming created new opportunities for games of skill, including games of skill having random

elements. They recognized that many games use random numbers to determine game elements and properties, and determined that online games of skill which are inherently competitive could benefit from a common gameplay experience that standardizes those random elements. '564 Patent at 14:51-60 ("Since random numbers are typically used in gameplay engines to decide game elements and properties (e.g., what obstacles are present can be decided based on the value that a random number generator returns), the use of common random numbers can provide a common gameplay experience to a subset of users (e.g., the players involved in a third party game tournament). The common gameplay experience can be used to standardize (or level the playing field) for a game of skill that still has random elements."). To realize this improvement, the inventors conceived of an improvement to the operation of the computer system which is embodied in the claims of the '564 Patent that "caus[es] gameplay to be different between tournaments, but not between game instances in a given tournament." '564 Patent at 15:5-7.

86. The '564 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of online digital games. The solution implemented by the '564 Patent provides a specific and substantial improvement over prior ways of running online digital games that would not provide a common experience to all participants, resulting in an improved method for facilitating fair, skill-based online digital games, including games having random elements. The '564 Patent achieves this result by introducing novel elements such as, among other things, receiving a stream of pseudo random number seeds characterized by a unique match identifier, using this stream to generate a plurality of pseudo-random numbers, and executing the game instance by the client and using those pseudo-random numbers to provide an online competition where a beginning of gameplay experience is common between at least two clients.

87.     The claims of the '564 Patent recite and embody Skillz's innovative, unconventional solution to the problem of providing a common experience to all participants in an online digital game competition, including one having random elements.  For example, claim 1 recites "[a] method comprising: receiving, at a client including an executable game instance, a stream of pseudo random number seeds characterized by a unique match identifier for an online digital gaming competition, the client enrolled in the online competition; receiving, at the client and from a game server, game data for executing the game instance, the game instance requiring one or more random numbers to complete execution of the game instance; generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers; and executing the game instance by the client and using the plurality of pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition; wherein at least one of receiving, generating, and executing is implemented by at least one data processor forming part of at least one computing system."  '564 Patent at claim 1.

88.     The '564 Patent further claims "[t]he method of claim 1, wherein the game instance provides a game of skill having random elements."  '564 Patent at claim 3.

### '564 Patent Allegations

89.     AviaGames has infringed and is infringing, either literally or under the doctrine of equivalents, the '564 Patent in violation of 35 U.S.C. § 271 *et seq*., directly by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems (hereinafter "the Accused Products") that infringe at least claim 1 of the

'564 Patent.  The Accused Products are non-limiting examples identified based on publicly available information, and Skillz reserves the right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

90.    On information and belief after reasonable investigation, the '564 Accused Products include the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated game servers.

91.    As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claims 1 and 3 of the '564 Patent in connection with the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems.  This description is based on publicly available information.  Skillz reserves the right to modify this description including, for example, on the basis of information about the Accused Products that it obtains during discovery.

*1(a) A method comprising:* - AviaGames makes and/or uses the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems.  Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the Accused Products, as the Accused Products perform a method as further described below for the remaining claim limitations.

*1(b) receiving, at a client including an executable game instance, a stream of pseudo random number seeds characterized by a unique match identifier for an online digital gaming competition, the client enrolled in the online competition;* - For example, on information and belief, the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire

Clash", "21 Gold", "Explodocube", and "Tile Blitz", which is an executable game instance running on an iOS client, receive a stream of pseudo random number seeds. On information and belief, the stream of pseudo-random number seeds received by the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", is characterized by a unique match identifier for an online digital gaming competition in which the client is enrolled (such as a competition of Solitaire!).



COMPLAINT FOR PATENT INFRINGEMENT



*1(c) receiving, at the client and from a game server, game data for executing the game instance, the game instance requiring one or more random numbers to complete execution of the game instance*; – For example, on information and belief, the game instances which run on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", require one or more random numbers. The games available on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", include games with random and semi-random elements (such as Solitaire!), which necessitate the use of random numbers to complete execution of the game instance. On information and belief, the game instances which run on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", require receiving game data for executing the game instance at the client and from a game server, as they cannot be played without a connection to the Internet.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    *1(d) generating, using the stream of pseudo-random number seeds, a plurality*
17 *of pseudo-random numbers; and -* For example, on information and belief, the
18 stream of pseudo-random number seeds is used to generate a plurality of pseudo-
19 random numbers that can be used to decide game elements and properties (such as
20 the starting hand and deck of a game of Solitaire!).

21    *1(e) executing the game instance by the client and using the plurality of*
22 *pseudo-random numbers to provide the online competition to a player such that a*
23 *beginning of gameplay experience is common between the game instance and a*
24 *second game instance executing on a second client enrolled in the online digital*
25 *gaming competition; -* For example, on information and belief, the iOS client
26 executes the game instances that run within the Pocket7Games application or a
27 standalone game application, including applications titled "Bingo Clash", "Solitaire
28 Clash", "21 Gold", "Explodocube", and "Tile Blitz".  On information and belief,

those game instances use the pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience (such as the starting hand and deck of a game of Solitaire!) is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition.



(https://www.facebook.com/Pocket7Games/posts/2207533026058051.)

    *1(f) wherein at least one of receiving, generating, and executing is implemented by at least one data processor forming part of at least one computing system.* - For example, on information and belief, the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", that performs the receiving, generating, and executing steps outlined above runs on an iOS device, which is a computing system that executes the application on at least one data processor.



3 *The method of claim 1, wherein the game instance provides a game of skill having random elements* - On information and belief, as detailed above, the Accused Products perform the method of claim 1. In addition, for example and on information and belief, the game instance provides a game of skill having random elements (such as Solitaire!).



-38-                    Case No. _____

TONS OF FUN GAMES FOR REAL MONEY

Bingo Clash: Play classic Bingo games with fun buffs. Beat your opponent in fast-paced Bingo games and daub the numbers as quickly as possible to earn money in cash games.

Solitaire!: A fun new take on a classic card game. Test your Solitaire skill against opponents and make money at the same time.

21 Gold: A lightning-fast version of Blackjack. If you're a fan of math games, show off your skill in this classic casino card game.

(Description of Pocket7Games in the Apple App Store.)

92.     Skillz has been damaged by AviaGames's infringement of the '564 Patent and will continue to be damaged unless AviaGames is enjoined by this Court. Skillz has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.  The balance of hardships favors Skillz, and public interest is not disserved by an injunction.

93.     On information and belief, AviaGames markets, offers, and distributes the infringing Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", in and within the United States, including through distribution platforms such as the Apple App Store as well as its own website, www.pocket7games.com.

94.     On information and belief, the accused Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire

Clash", "21 Gold", "Explodocube", and "Tile Blitz", are the primary or only products and services offered by AviaGames in the United States.

95.     On information and belief, AviaGames has also designed, developed, tested, and used the infringing applications and services in and within the United States.

96.     Skillz is entitled to recover from AviaGames all damages that Skillz has sustained as a result of AviaGames's infringement of the '564 Patent, including without limitation lost profits and not less than a reasonable royalty.

### PRAYER FOR RELIEF

WHEREFORE, Skillz respectfully requests:

A.     That Judgment be entered that AviaGames has directly infringed one or more claims of the '602 and '564 Patents, directly and/or indirectly, literally and/or under the doctrine of equivalents;

B.     That, in accordance with 35 U.S.C. § 283, AviaGames and all its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with it, be enjoined from (1) infringing the '602 and '564 Patents and (2) making, using, selling, and offering for sale the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and/or backend servers and systems enabling the accused functionality of such applications;

C.     An order directing AviaGames to file with the Court and serve upon Skillz's counsel within thirty (30) days after entry of the order of injunction, a report setting forth the manner and form in which AviaGames has complied with the injunction, including the provision relating to destruction and recall of infringing products and materials;

D.     An award of damages sufficient to compensate Skillz for AviaGames's infringement under 35 U.S.C. § 284;

1    E.    Costs and expenses in this action;

2    F.    An award of prejudgment and post-judgment interest; and

3    G.    Such other and further relief as the Court may deem just and proper.

4

5                        **DEMAND FOR JURY TRIAL**

6        Skillz hereby demands trial by jury for all causes of action, claims, or issues

7    in this action that are triable as a matter of right to a jury.

8

9    DATED:  April 5, 2021                QUINN EMANUEL URQUHART  &
                                         SULLIVAN, LLP
10

11                              By:  */s/ Sean S. Pak*

12                                   Sean S. Pak (Bar No. 219032)
                                     seanpak@quinnemanuel.com
13                                   50 California Street, 22nd Floor
                                     San Francisco, CA 94111
14                                   Telephone: (415) 875-6600
                                     Facsimile: (415) 875-6700
15

16                                   Robert M. Schwartz (Bar No. 117166)
17                                   robertschwartz@quinnemanuel.com
                                     Lance L. Yang (Bar No. 260705)
18                                   lanceyang@quinnemanuel.com
                                     865 S. Figueroa Street, 10th Floor
19                                   Los Angeles, CA 90017
                                     Telephone: (213) 443-3000
20                                   Facsimile: (213) 443-3100
21

22                                   Ron Hagiz (*pro hac vice forthcoming*)
23                                   ronhagiz@quinnemanuel.com
                                     51 Madison Avenue, 22nd Floor
24                                   New York, NY 10010
                                     Telephone: (212) 849-7000
25                                   Facsimile:  (212) 849-7100
26

27                                   *Attorneys for Plaintiff Skillz Platform Inc.*

28

                                     -41-              Case No. _____