1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SKILLZ PLATFORM INC., <br><br>          Plaintiff, <br><br>     v. <br><br> AVIAGAMES INC., <br><br>          Defendant. | Case No.  21-cv-02436-BLF <br><br> **ORDER CONSTRUING CLAIMS IN U.S. PATENT NO. 9,649,564** <br><br> [Re:  ECF Nos. 72, 75, 79, 115, 116] |

Plaintiff Skillz Platform Inc. ("Skillz") brings this patent infringement action against Defendant AviaGames Inc. ("AviaGames"), claiming AviaGames infringes U.S. Patent No. 9,649,564 (the "'564 Patent") through its mobile gaming platform.[1] The Court held a *Markman*[2] hearing on April 29, 2022 for the purpose of construing the sole disputed term in the '564 Patent. The parties disagree about the construction of the term "a stream of pseudo random number seeds characterized by a unique match identifier" in the independent claims of the '564 Patent, focusing on the breadth of the phrase "characterized by." AviaGames argues that "characterized by" requires the "unique match identifier" to be "an intrinsic component" of the "stream of pseudo random number seeds." *See* AviaGames Suppl. Brief, ECF No. 116.  Skillz argues that "characterized by" requires the "unique match identifier" is "describing or used for generating the pseudo random number seeds." *See* Skillz Suppl. Brief, ECF No. 115.  The parties submit expert declarations in support of their constructions.  *See* Welch Decl., ECF No. 116-1; Zagal Decl., ECF No. 115-2.

Based on the below reasoning, the Court ADOPTS the following modified version of

---

[1] Skillz originally also asserted infringement of U.S Patent No. 9,479,602 (the "'602 Patent").  *See* Complaint, ECF No. 1 ¶¶ 57–78.  The Court dismissed Skillz's '602 Patent infringement claim based on a lack of patent eligible subject matter under 35 U.S.C. § 101.  *See* Order, ECF No. 80.
[2] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

1   Skillz's construction for the term "a stream of pseudo random number seeds characterized by a

2   unique match identifier": "a stream of pseudo random number seeds wherein a unique match

3   identifier is used for generating the stream of pseudo random number seeds." The Court further

4   ADOPTS the following construction—agreed to by the parties—for the term "generating, using the

5   stream of pseudo-random number seeds, a plurality of pseudo-random numbers" in the independent

6   claims of the '564 Patent: "generating, at the client and using the stream of pseudo-random number

7   seeds, a plurality of pseudo-random numbers."

## I.   BACKGROUND

### A.   Background and Description of the Invention

10   Skillz is a Delaware corporation with its principal place of business in Oregon. *See*

11   Complaint, ECF No. 1 ¶ 12. Skillz maintains a mobile gaming platform that enables third-party

12   game developers to make games available on the platform through a Software Development Kit

13   ("SDK"). *See id.* ¶¶ 2, 12, 22–27, 32–44. Skillz owns the '564 Patent. *See id.* ¶ 82. AviaGames is

14   a Delaware corporation with its principal place of business in California. *See id.* ¶ 13. Skillz alleges

15   that AviaGames maintains a competing mobile gaming platform—Pocket7Games—which

16   AviaGames developed using Skillz's intellectual property that it gleaned while developing games

17   for Skillz's platform. *See id.* ¶¶ 4–11, 45–56.

18   Skillz asserts one patent against AviaGames—the '564 Patent, which relates to mobile

19   gaming. Skillz alleges that AviaGames' Pocket7Games application and standalone game

20   applications—including "Bingo Clash," "Solitaire Clash," "21 Gold," "Explodocube," and "Tile

21   Blitz"—infringe the Asserted Patent. *See id.* ¶¶ 79–96.

22   The '564 Patent, which is entitled "Peer-to-Peer Wagering Platform," was filed on

23   December 21, 2015 and granted on May 16, 2017. *See* '564 Patent at 1. The '564 Patent belongs

24   to a line of continuation and continuation-in-part applications leading back to an application filed

25   on August 8, 2012.

26   There are three independent claims in the '564 Patent: claims 1, 11, and 18.[3] Claim 1 of the

27

28   _____

[3] The dependent claims of the '564 Patent are not at issue in claim construction.

United States District Court
Northern District of California

'564 Patent provides the following:

> 1. A method comprising:
>
> receiving, at a client including an executable game instance, a stream of pseudo random number seeds characterized by a unique match identifier for an online digital gaming competition, the client enrolled in the online competition;
>
> receiving, at the client and from a game server, game data for executing the game instance, the game instance requiring one or more random numbers to complete execution of the game instance;
>
> generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers; and
>
> executing the game instance by the client and using the plurality of pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition;
>
> wherein at least one of receiving, generating, and executing is implemented by at least one data processor forming part of at least one computing system.

'564 Patent, Claim 1. Claim 11 of the '564 Patent is substantially the same as claim 1, but it claims a "non-transitory computer program product storing instructions." And claim 18 of the '564 Patent is substantially the same as claim 1, but it is a system claim.

While the '564 Patent specification generally relates to a "peer-to-peer wagering platform" that provides targeted advertising, the independent claims pertain to generating pseudo random numbers for mobile gaming tournaments to ensure randomized gameplay that is consistent across gaming sessions. The '564 Patent discloses a mobile gaming platform consisting of servers providing game content to client devices. *See* '564 Patent, 2:4–9. The platform allows for gaming tournaments, consisting of one or more matches, where users compete against each other in different instances of the same game and can win prizes based on their performance. *See id.*, 7:61–8:33, 9:16–33, 10:14–61. Games can be single-player games like Tetris, where a player competes with other players by performing well in their own instance of the game and obtaining a high score or performing well in other metrics. *See id.*, 14:61–15:2; 10:26–35.

Such games can require an element of randomness—for example, a Tetris user does not see

United States District Court
Northern District of California

the same initial series of blocks every game. *See id.*, 14:61–63. The '564 Patent discloses that random elements in games are "typically" provided using a "stream of pseudo-random numbers." *Id.*, 14:49–53. Pseudo random numbers are generated by a pseudo random number generator function, which outputs a series of numbers in an approximately random distribution. Given a particular input or "seed" value, a pseudo random number generator function provides the same series of approximately random numbers.

Random gameplay comes at a cost in a competitive tournament setting—if two competing users receive different game instances, then the competition may not be fair. *See id.*, 14:55, 14:63–67. The alleged invention of the '564 Patent delivers "a game of skill that still has random elements." *Id.*, 14:57–60, 5:33–35. The '564 Patent discloses that each mobile gaming tournament or match has a "unique tournament ID" number or "unique match identifier." *See id.*, 13:24–25; 16:10–14; 16:61–65; 18:6–10. The independent claims of the '564 Patent recite "a stream of pseudo random number seeds characterized by a unique match identifier," which are then used to generate the pseudo random numbers. *See id.*, 16:10–14, 16:19–20; 16:61–65; 17:34; 18:6–10; 18:15–16. This ensures that "a beginning of gameplay experience is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition." *See id.*, 18:17–23.

During prosecution of the '564 Patent, the initial set of claims considered by the examiner were substantially the same as the resulting claims. The only difference relates to the phrase "pseudo random number seeds *characterized by* a unique match identifier" in the final claims. The "characterized by" language in the final claims was initially "associated with" in the preliminary claims. Accordingly, the preliminary claims recited "pseudo random number seeds *associated with* a unique match identifier." *See* January 26, 2016 Amendment, ECF No. 75-3 at 2–5 (emphasis added). On August 23, 2016, the examiner issued a non-final rejection of the preliminary claims as invalid under § 103, finding the independent claims with the "associated with" language obvious in light of U.S. Patent Application No. 2010/0022307 ("Steuer") and U.S. Patent Application No. 2010/0311496 ("Taylor"). *See* August 23, 2016 Non-Final Rejection, ECF No. 75-4 ¶¶ 13–17. The examiner found that Steuer taught all elements of the claims, except the limitation requiring the

stream of pseudo-random number seeds to be "associated with a unique match identifier." *See id.* ¶ 16. For this "associated with" limitation, the examiner found it was obvious based on the Taylor reference, since Taylor discloses using a seed combined with a current date and time to produce a unique input value for a game. *See id.* ¶ 16. In response to the non-final rejection, the applicants amended the claims to their final form—replacing "associated with" with "characterized by" in the independent claims. *See* November 22, 2016 Amendment, ECF No. 75-5. The examiner granted the patent as amended. *See* January 18, 2017 Notice of Allowance, ECF No. 75-6.

### B.    Agreed Constructions

The parties agreed on the construction of one term in the '564 Patent: "generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers". *See* AviaGames Responsive Brief, ECF No. 75 at 18–19. Further, whereas AviaGames initially argued that claims 11 and 18 were indefinite, in its responsive claim construction brief, AviaGames stated that the agreed construction of the "generating" term "obviate[d]" its indefiniteness position. *See id.* at 20. The Court accordingly approves and adopts the following construction:

| Term | Agreed Construction |
| --- | --- |
| "generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers" ('564 Patent, Claims 1, 11, 18) | "generating, at the client and using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers" |

### C.    Claim Terms at Issue

The parties dispute the construction of a single term in claims 1, 11, and 18 of the '564 Patent: "a stream of pseudo random number seeds characterized by a unique match identifier."

## II.    LEGAL STANDARD

Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). Claim construction should "aid[] the court and the jury in understanding the term as it is used in the claimed invention." *Funai Elec. Co. Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010).

In construing the claims of a patent, a disputed term is generally given "the meaning that the

United States District Court
Northern District of California

United States District Court
Northern District of California

term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  It is a "bedrock principle of patent law" that the "claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (citations and quotation marks omitted).  As such, the "appropriate starting point" for a court interpreting the patent "is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

The Court reads claims in light of the specification, which is the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.  The interpretation given to a term "can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop within the claim." *Id.* at 1316 (citations omitted); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  The words of the claims must therefore be understood as the inventor used them, as such understanding is revealed by the patent and prosecution history.  *See Phillips*, 415 F.3d at 1316.  The claim language, written description, and patent prosecution history form the intrinsic record that is most significant when determining the proper meaning of a disputed claim.  *See id.* at 1315–17; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Evidence external to the patent is less significant than the intrinsic record, but the court may also consider such extrinsic evidence as expert and inventor testimony, dictionaries, and learned treatises "if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980).  However, extrinsic evidence may not be used to contradict or change the meaning of claims "in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Id.* at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

While the words of a claim are generally given their ordinary and customary meaning, *id.* at 1312, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," *id.* at 1316.  In such cases, "the inventor's lexicography governs." *Id.* at 1316.  Alternatively, the intrinsic record "may reveal an intentional

6

disclaimer, or disavowal, of claim scope by the inventor." *Id.*  In that instance as well, "the inventor has dictated the correct claim scope, and the inventor's intention . . . is regarded as dispositive." *Id.*  "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Computer Entertainment Am.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quotation marks and citations omitted).  "The standard for disavowal of claim scope is similarly exacting." *Id.* at 1366.  "Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics v. LifeScan*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).

## III.    DISCUSSION

### A.    "A Stream of Pseudo Random Number Seeds Characterized by a Unique Match Identifier" (Claims 1, 11, 18)

|  | **Skillz's Construction** | **AviaGames' Construction** |
|---|---|---|
| **Original Construction** | Plain and ordinary meaning, i.e., "characterized by" includes more than "is" | characterized by "a stream of pseudo random number seeds characterized by a unique match identifier" means that the unique match identifier is used as the stream of pseudo random number seeds |
| **Supplemental Construction** | a stream of pseudo random number seeds wherein a unique match identifier is describing or used for generating the stream of pseudo random number seeds | "characterized by" in the challenged phrase means that the unique match identifier is an intrinsic component of the pseudo random number seeds |

The parties dispute the appropriate construction for the term "a stream of pseudo random number seeds characterized by a unique match identifier" in independent claims 1, 11, and 18 of the '564 Patent.  The dispute centers on the scope of the "characterized by" language.  AviaGames initially argued that "characterized by" should be construed as "is," such that the stream of pseudo random number seeds in the claims was required to *be* the unique match identifier.  *See* AviaGames Responsive Brief, ECF No. 75.  Skillz initially argued that AviaGames' construction was too narrow, and that "characterized by" should be construed to "include[] more than 'is.'"  *See* Skillz Opening Brief, ECF No. 72; Skillz Reply Brief, ECF No. 79.  At the Court's *Markman* hearing on

1    April 29, 2022, AviaGames clarified its construction, arguing that "characterized by" should be

2    construed to mean that the unique match identifier is an intrinsic component of the pseudo random

3    number seeds.   The parties exchanged supplemental briefing with new constructions.   *See*

4    AviaGames Suppl. Brief, ECF No. 116; Skillz Suppl. Brief, ECF No. 115.   In AviaGames'

5    supplemental construction, "a stream of pseudo random number seeds characterized by a unique

6    match identifier" means "that the unique match identifier is used as the stream of pseudo random

7    number seeds."   *See* AviaGames Suppl. Brief, ECF No. 116.   Skillz's revised construction for the

8    disputed term is "a stream of pseudo random number seeds wherein a unique match identifier *is*

9    *describing or used for* generating the stream of pseudo random number seeds."   *See* Skillz Suppl.

10   Brief, ECF No. 115 (emphasis added).

11        Having considered all of the intrinsic and extrinsic evidence submitted by the parties, it is

12   no wonder that Skillz and AviaGames submit such divergent claim constructions.   None of the

13   preferred indicia of claim scope convincingly addresses the proper limitation of "characterized by."

14   Each party cobbles together a justification for its construction, and as shown below, the Court also

15   is left to dig deep to find a reasonable construction of "characterized by."

16                    **1.   Initial Briefing and *Markman* Hearing**

17        In their initial briefing on claim construction (ECF Nos. 72, 75, 79), the parties disputed how

18   broadly the phrase "characterized by" should be construed.   The dispute was over whether the stream

19   of pseudo-random number seeds used to generate pseudo-random numbers must be the unique

20   match identifier itself (AviaGames' position), or whether the claims cover a broader set of

21   circumstances (Skillz's position).   Based on the parties' initial briefing, the Court had concerns

22   about both parties' proposed constructions.   AviaGames' construction appeared to be based on an

23   "example" embodiment in the specification and ambiguous prosecution history disclosures—neither

24   of which are sufficient to support a construction.   *See* '564 Patent, 15:3–7; *Littelfuse, Inc. v. Mersen*

25   *USA EP Corp.*, 29 F.4th 1376, 1381 (Fed. Cir. 2022); *MIT v. Shire Pharm., Inc.*, 839 F.3d 1111,

26   1119–20 (Fed. Cir. 2016).   Skillz provided no affirmative construction for the term "characterized

27   by"—instead, Skillz merely responded to AviaGames' construction.   Further, the Court found

28   Skillz's "plain and ordinary meaning" construction inadequate, because the Court did not consider

United States District Court
Northern District of California

8

1   the plain and ordinary meaning of "characterized by" in the context of the claims to be evident.  A

2   *Markman* hearing was held on April 29, 2022, during which the Court indicated its concerns with

3   the parties' constructions and AviaGames sought to clarify its proposed construction.  Ultimately,

4   the Court instructed the parties to exchange revised constructions and submit supplemental briefing.

5   The parties submitted their supplemental briefs on May 17, 2022.  *See* ECF Nos. 115–16.

6   ### 2.  Supplemental Briefing

7   The parties proposed the following constructions in their supplemental briefing:

| "a stream of pseudo random number seeds characterized by a unique match identifier" ('564 Patent, Claims 1, 11, and 18) | |
| --- | --- |
| **Skillz's Supplemental Construction** | **AviaGames' Supplemental Construction** |
| a stream of pseudo random number seeds wherein a unique match identifier is describing or used for generating the stream of pseudo random number seeds | "characterized by" in the challenged phrase means that the unique match identifier is an intrinsic component of the pseudo random number seeds |

13   The parties now agree that "a stream of pseudo random number seeds characterized by a

14   unique match identifier" means that the stream of pseudo random number seeds is derived in some

15   way from the unique match identifier.  The parties dispute the limits on how that derivation process

16   can take place within the scope of the claims.[4]  According to Skillz, the unique match identifier is

17   "describing or used for generating" the stream of pseudo random number seeds.  AviaGames argues

18   that the unique match identifier is an "intrinsic component" of the stream of pseudo random number

19   seeds.

20   In support of its proposed construction, AviaGames argues that the unique match identifier

21   is a number, so it is concrete and therefore characterized only by its "objectively observable

22   components"—not "subjective characteristics such as cheap, expensive, long, short, etc" that can

---

[4] At the April 29, 2022 hearing, the parties indicated that their ultimate dispute is whether a stream of pseudo random number seeds "characterized by" a unique match identifier includes the accused functionality in AviaGames' technology—*i.e.*, seeds generated by plugging a unique match identifier into a lookup table where a given match identifier is matched up with certain seeds. However, "claims may not be construed with reference to the accused device." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330–31 (Fed. Cir. 2006) (quoting *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002)). Accordingly, the Court proceeds with its claim construction analysis without reference to whether a stream of pseudo random number seeds generated by a lookup table is within the scope of the claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "change on a whim." *See* AviaGames Suppl. Brief, ECF No. 116 at 1.  Accordingly, AviaGames

2   argues that a unique match identifier can characterize a stream of seeds only if the identifier is part

3   of that stream of seeds—*i.e.*, it is one of the "objectively observable components." *See id.*  For

4   example, AviaGames argues that if the unique match identifier is the number "123," then the stream

5   of pseudo random number seeds "characterized by" that identifier could be "**123**456," "**123***456,"

6   or "log(**123**)." *See id.*

7        In support of its construction, AviaGames cites dictionary definitions for "characterize"

8   indicating that it means to describe an essential or distinguishing character or quality of something.

9   *See id.* at 1–3.  AviaGames also cites the specification of the '564 Patent, again pointing out that the

10  sole disclosure of pseudo random number generation involves using the unique match identifier

11  itself as a seed.  *See id.* at 3–4 (citing '564 Patent, 15:3–5).  Further, AviaGames argues that the

12  '564 specification uses "characterizing" to describe the contents of something—including "data

13  characterizing advertisements" to mean "advertising logic, invitations and/or messages."  *See id.*

14  at 3–4 (citing, e.g., '564 Patent, Fig. 11, 5:55–56).   Additionally, AviaGames argues that its

15  construction is supported by Skillz's prior briefing in opposition to AviaGames' § 101 motion,

16  where Skillz indicated that the pseudo random seeds in the '564 claims were "based on" the unique

17  match identifier and the unique match identifier was "used for" generating the seeds.  *See id.* at 5.

18  AviaGames further argues, as it did in its initial briefing, that Skillz is seeking to recapture

19  disclaimed claim scope based on the prosecution history.  *See id.* at 5.

20       In response to Skillz's proposed construction, AviaGames argues that the "describing" part

21  of Skillz's construction is overbroad and ignores the numeric context of the claims—the only way

22  for a number to "describe" another number is to "become the other number's intrinsic component."

23  *See id.* at 2.  Further, AviaGames argues that the "used for generating" component of Skillz's

24  construction blurs the claim scope, because any computer creating pseudo random number seeds

25  would perform a "generating" operation that would use "identifiers." *See id.* at 3.

26       AviaGames also supports its proposed construction with an expert declaration from Dr.

27  Gregory Welch, Pegasus Professor and the AdventHealth Endowed Chair in Healthcare Simulation

28  at the University of Central Florida.  *See* Welch Decl., ECF No. 116-1 ¶ 5.  Dr. Welch opines that a

POSITA would understand that a unique match identifier must have a "deterministic and direct role" in the creation of pseudo random number seeds, requiring the identifier to be an intrinsic component of the seed.  *See id.* ¶¶ 30–33, 37.

Skillz's proposed construction of the disputed '564 Patent claim language requires that the unique match identifier is "describing or used for generating" the stream of pseudo random number seeds.  In support of its construction, Skillz argues that whenever the word "characterizing" appears in the '564 specification, it means that one thing describes or is used for generating another thing. *See* Skillz Suppl. Brief, ECF No. 115 at 1–2.  For example, Skillz argues that the '564 specification indicates that "data characterizing advertisements" can include "advertising logic, invitations, and/or messages." *See id.* at 1 (citing '564 Patent, 5:55–57).  Skillz argues that advertising logic is "used for generating" advertisements, whereas invitations and messages "describ[e]" advertisements. *See id.* at 1–2; *see also* '564 Patent, 1:47–56, 3:6–7.

Further, Skillz argues that its construction is consistent with the prosecution history, where Skillz amended the claims such that the unique match identifier cannot merely be loosely "associated with" the stream of pseudo random number seeds.  *See* Skillz Suppl. Brief, ECF No. 115 at 2–3.  Skillz argues that its "describing or used for generating" construction for "characterized by" is narrower than the scrapped "associated with" claim language.  *See id.* at 2–3.  Additionally, Skillz argues that AviaGames' dictionary definitions support its construction, since they indicate that to "characterize" involves "describ[ing]" the quality or character of something.  *See id.* at 3.

In response to AviaGames' proposed construction, Skillz argues that AviaGames' construction introduces confusion by failing to explain the difference between an "intrinsic component" of a stream of seeds and a non-intrinsic component.  *See* Skillz Suppl. Brief, ECF No. 115 at 3.  Further, Skillz argues that the term "intrinsic" has no basis in the claims, the specification, the prosecution history, or AviaGames' dictionary definitions.  *See id.*  Additionally, Skillz argues that AviaGames' construction is inconsistent with how the specification uses the term "characterizing." *See id.* at 3–4.  For example, Skillz points out that the '564 Patent specification states that "data characterizing advertisements" includes "advertising logic." *See id.* at 3–4 (citing '564 Patent, 6:45–48).  Skillz argues that you cannot see such logic in the ad itself, so such logic

1    does not "characterize" the ad under AviaGames' construction.  *See id.*

2        Skillz also provides an expert declaration from Dr. José Zagal, professor for the

3    Entertainment Arts & Engineering program at the University of Utah.  *See* Zagal Decl., ECF No.

4    115-2 ¶ 1.  Dr. Zagal opines that a POSITA would understand that there are different ways for a

5    stream of pseudo random number seeds to be "characterized by" a unique match identifier.  *See id.*

6    ¶ 34.  Further, Dr. Zagal opines that the "intrinsic component" language in AviaGames' proposed

7    construction is not commonly used in the industry and would be impractical and nonsensical to a

8    POSITA.  *See id.* ¶¶ 45–53.

9        To evaluate the parties' competing positions, the Court assesses (1) the claim language; (2)

10   the specification; (3) the prosecution history; and (4) the extrinsic evidence.

### a.  Claim Language

12       As *Phillips* instructs, the Court begins with the claim language.  *See Phillips*, 415 F.3d

13   at 1312.  The independent claims of the '564 Patent recite a client that "include[s] an executable

14   game instance" and which is "enrolled in" an "online digital gaming competition."  *See* '564 Patent,

15   16:10–14, 16:61–65, 18:6–10.  The client "receiv[es] . . . a stream of pseudo random pseudo random

16   number seeds characterized by a unique match identifier for [the] online digital gaming

17   competition."  *See* '564 Patent, 16:11–12, 16:62–63, 18:7–8.  These pseudo random number seeds

18   are then used to "generat[e] . . . a plurality of pseudo-random numbers."  *See id.*, 16:19–20, 17:3–4,

19   18:15–16.  The "plurality of pseudo-random numbers" is then used in executing a game instance by

20   a client "to provide the online competition to a player such that a beginning of gameplay experience

21   is common between the game instance and a second game instance executing on a second client

22   enrolled in the online digital gaming competition."  *See id.*, 16:21–27, 17:5–11, 18:17–23.

23       The claims provide little guidance on the meaning of "characterized by."  The only limitation

24   on the relationship between the unique match identifier and the pseudo random number seeds the

25   claims appear to contain is that the process as a whole results in a common "beginning of gameplay

26   experience" for multiple players.  *See id.*, 16:21–27, 17:5–11, 18:17–23.

27       Since the claims provide scant guidance, the Court moves on to considering the specification

28   and the prosecution history for insight on the disputed claim language.

United States District Court
Northern District of California

**b. Specification**

The Court next considers the specification.  The specification discusses the use of "common random numbers" across a subset of users to ensure a "common gameplay experience [that] can be used to standardize (or level the playing field) for a game of skill that still has random elements." *See* '564 Patent, 14:51–60.  Specifically, the specification discusses using common pseudo random numbers for all participants in a game tournament to ensure that the results of the tournament are "based entirely on skill, and not on a random chance of getting an easier" game instance. *See id.*, 14:61–15:2.  The specification provides "one example" of such a system in which a "tournament identification number" is used "as a seed to generate pseudo-random numbers, thus causing gameplay to be different between tournaments, but not between game instances involved in a given tournament." *See id.*, 15:3–7.

The specification supports that the essential element of the relationship between the unique match identifier and the stream of pseudo random number seeds is that the unique match identifier is used to generate the pseudo random number seeds.  In other words, the pseudo random number seeds depend on the unique match identifier.  This ensures that initial gameplay is random, but it is uniform between game instances for different participants in a given match or tournament. *See id.*, 15:3–7.  While the unique match identifier varies between matches or tournaments, it is the same for all participants in a match or tournament. *See id.*, 13:24–25.  Accordingly, if the pseudo random number seeds are generated using the unique match identifier, then the pseudo random number seeds will vary between matches and tournaments, but they will be consistent among participants in the same match or tournament.  The key is that all elements—unique match identifier, pseudo random number seeds, and pseudo random numbers—are the same for all participants in a given tournament.  As long as the unique match identifier is the same for all tournament participants, and the process for deriving pseudo random number seeds and pseudo random numbers is the same, then all tournament participants will have a "common gameplay experience." *See* '564 Patent, 14:51–60.  There is no indication in the specification that any further limitation on the relationship between the unique match identifier and the stream of pseudo random number seeds is necessary to ensure common gameplay amongst tournament participants.  It appears that the specification is silent as to

1    specifically how the unique match identifier and the stream of pseudo random number seeds relate

2    to each other—all that is required is that the unique match identifier is used to generate the stream

3    of pseudo random number seeds.

4         Nothing in the specification indicates that the unique match identifier is required to be "an

5    intrinsic component" of the stream of pseudo random number seeds.  AviaGames argues that the

6    "sole disclosure relating to seeds"—*i.e.*, the "one example" in the specification in which a

7    "tournament identification number" is used as a pseudo random number seed—indicates that the

8    match identifier is a component of a seed.  *See* AviaGames Suppl. Brief, ECF No. 116 at 3 (citing

9    '564 Patent, 15:3–5).  But this appears to be nothing more than an improper attempt by AviaGames

10   to import limitations from an "example" embodiment in the specification into the claims.  *See Cont'l*

11   *Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (declining to limit claims to

12   specification embodiment described as "one technique" and an "example"); *Littelfuse*,

13   29 F.4th at 1381.

14        Further, AviaGames' focus on the "one example" from the specification ignores the context

15   provided by the surrounding disclosures—that the pseudo random number seeds used by a game

16   instance must depend on the unique match identifier so that gameplay is random, but uniform among

17   different participants in the same tournament.  This context suggests that the invention relates to a

18   broader set of relationships between the unique match identifier and the pseudo random number

19   seeds than suggested by the single "example" embodiment in the specification—where the unique

20   match identifier *is* the stream of pseudo random number seeds.  AviaGames' only cited case involves

21   limiting a claim term based on the specification's "only description . . . that casts light on what [the

22   term] is and that enables one of ordinary skill in the art to achieve the objects of the claimed

23   invention."  *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017).  However, as the

24   Court outlines above, the "example" embodiment in the '564 Patent specification that AviaGames

25   points to is *not* the "only description . . . that casts light on" the meaning of the disputed claim

26   language here.  *Id.*  Accordingly, AviaGames' case authority is distinguishable.

27        The specification also uses the word "characterizing" in several contexts unrelated to the

28   pseudo random number generation process.  The specification refers to "[d]ata characterizing

United States District Court
Northern District of California

historical skills-based gaming metrics" for users ('564 Patent, Abstract, 1:47–49, 5:67–6:2); a "characterization of [a player's] historical skills-based gaming metrics" (*id.*, Abstract, 1:53–54, 1:63–64, 2:15–16, 6:8–10, 7:5–7, 7:15–21, 7:25–27, 7:37–40); "[d]ata characterizing the targeted advertisement" (*id.*, 1:55–56); "data characterizing a plurality of players and a wager amount for each player" (*id.*, 3:6–7, 8:60–61); "[d]ata characterizing a confirmation that each of the plurality of players funds were successfully secured" (*id.*, 3:14–16, 3:61–64); "[d]ata characterizing the outcome of the third party skills based gaming competition" (*id.*, 3:47–48, 4:3–4, 9:16–17); "[d]ata characterizing the winnings and losses of one or more of the plurality of players" (*id.*, 3:52–54); "data characterizing the transfer" of funds or non-monetary compensation between players (*id.*, 3:59–61, 4:28–29); "[d]ata characterizing the player's game play" (*id.*, 4:15–16, 14:21–22); and "data characterizing . . . in-game statistics" (*id.*, 9:28–29). Figure 11, reproduced below, further shows a "process flow diagram illustrating a method of providing data characterizing a targeted [sic]":



**FIG. 11**

The specification discloses that "data characterizing advertisements" can include "advertising logic, invitations, and/or messages." *Id.*, 5:55–57. The specification further discloses that advertisement

content can include "a comparison between or *characterization* of the historical gaming data and other players in the system (e.g., showing how much money the player would have won in a real tournament, a comparison of the player's average score to other player's average scores, a mock leader board where the game player is compared to all players of the game, etc.)." *Id.*, 7:13–21 (emphasis added).

The parties and their experts spill considerable ink arguing that the specification's use of the words "characterizing" and "characterization" supports the parties' respective constructions. But the Court finds these specification excerpts provide little guidance on what the "characterized by" claim language means in referring to the relationship between the unique match identifier and the stream of pseudo random number seeds. First, none of these specification excerpts discusses unique match identifiers or a stream of pseudo random number seeds. Rather, they pertain to (1) data or an advertisement summarizing or describing a past occurrence—including historical gameplay, the outcome of a game, and a transfer of funds between players—or (2) data representing a computer-generated element—including an advertisement or a confirmation. Second, none of these specification excerpts uses the phrase "characterized by"—they all disclose "characterizing" or "characterization."

To the extent the "characterizing" and "characterization" specification excerpts provide any guidance for the claim construction dispute at hand, they support Skillz's proposed construction. For example, the specification indicates that "data characterizing advertisements" includes "advertising logic, invitations, and/or messages." *Id.*, 5:55–57. AviaGames argues that each of "advertising logic, invitations, and/or messages" is "data of advertisements themselves." *See* AviaGames Suppl. Brief, ECF No. 116 at 4. While AviaGames' assertion seems consistent with "invitations" and "messages," since invitations and messages are content included within an advertisement, the Court finds AviaGames' assertion to be a stretch for "advertising logic." "Advertising logic" is not contained within an advertisement—rather, it is source code that is *used to generate* an advertisement. Perhaps a digital advertisement could be considered to "contain" the logic that is used to generate the advertisement. But this begs the question of why the same understanding should not be applied to the pseudo random number seeds at issue in the claims—are

United States District Court
Northern District of California

pseudo random number seeds not characterized by the logic used to generate them (*e.g.*, any unique match identifier used to derive them, regardless of how that derivation process took place)? Accordingly, while the specification's use of the words "characterizing" and "characterization" provide little guidance, they do provide some evidence that undermines AviaGames' construction and supports Skillz's construction.

The Court finds that the specification supports Skillz's construction—particularly the "used for generating" limitation in Skillz's construction.  Further, the Court finds that the specification disfavors AviaGames' construction, since there is little to no support in the specification for the "intrinsic component" limitation in AviaGames' construction.

### c.  Prosecution History

The Court next considers the prosecution history.  When the meaning of the relevant claim language is not plain courts look to the prosecution history to "inform[] the meaning of the disputed claim phrase and address[] an ambiguity otherwise left unresolved."  *See Univ. of Mass. v. L'Oreal S.A.*, --- F.4th ----, 2022 WL 2111840, at *7 (Fed. Cir. June 13, 2022) (quoting *Personalized Media Communs., LLC v. Apple Inc.*, 952 F.3d 1336, 1345 (Fed. Cir. 2020)).

The only potentially significant development during the prosecution history of the '564 Patent involved an August 23, 2016 non-final rejection.  On January 16, 2016, Skillz submitted amended claims 28 through 48, where independent claims 28, 38, and 45 were nearly identical to final claims 1, 11, and 18 (the claims containing the disputed claim language).  There was only a single difference between the preliminary claims and the final claims:  where the words "characterized by" appear in final claims 1, 11, and 18, preliminary claims 28, 38, and 45 contained the words "associated with."  *See* ECF No. 75-3, January 26, 2016 Preliminary Amendment at 2–5. The relevant clause of final claim 1 recites the following:

> receiving, at a client including an executable game instance, a stream of pseudo random number seeds *characterized by* a unique match identifier for an online digital gaming competition, the client enrolled in the online competition;

'564 Patent, Claim 1 (emphasis added).  The same clause in preliminary claim 28 recited the following:

> receiving, at a client including an executable game instance, a stream of pseudo random number seeds *associated with* a unique match identifier for an online digital gaming competition, the client enrolled in the online competition;

January 26, 2016 Preliminary Amendment, ECF No. 75-3 at 2 (emphasis added).

On August 23, 2016, the examiner issued a non-final rejection of all preliminary claims under 35 U.S.C. § 103 as obvious in light of the Steuer (U.S. Patent Application No. 2010/0022307) and Taylor (U.S. Patent Application No. 2010/0311496) references.  *See* August 23, 2016 Non-Final Rejection, ECF No. 75-4 ¶¶ 12–23.[5]  The examiner found that Steuer disclosed receiving a stream of pseudo random number seeds at a client for an online digital gaming competition.  *See id.* ¶ 14.  However, the examiner found that Steuer did not disclose that the stream of pseudo random number seeds is associated with a unique match identifier.  *See id.* ¶ 16.  The examiner found that Taylor disclosed the limitation missing from Steuer.  *See id.*  The examiner found as follows:

> Taylor teaches a system for generating games in which a current date and time of an event is combined with a seed to produce a unique input value for a game.  (See e.g. Taylor, ¶¶ 152-154.)  For example, Taylor combines seed data with external data (e.g. a date of an event), to drive a seed output/ticket generation system.  (Id.)  Examiner construes Taylor's associated [sic] of the seed with a unique date as teaching the claimed seed associated with a unique match identifier.

*See id.*  Following the non-final rejection, Skillz amended the claims—replacing "associated with" with "characterized by" in claims 28, 38, and 45.  *See* November 22, 2016 Amendment, ECF No. 75-5 at 3–6.  Skillz had a telephone interview with the examiner on November 21, 2016, during which "proposed claim amendments were discussed and agreement was reached that independent claims 28, 38, and 48, as currently amended, overcome the presently cited references but further search is required."  *See id.* at 2; *see also id.* at 9 ("agreement was reached that independent claims 28, 38, and 45, as amended herein, distinguish the claims over Steuer and Taylor, alone or in combination").  On January 18, 2017, the examiner allowed the amended claims.  *See* Notice of Allowance, ECF No. 75-6.

---

[5] Claim 35 was rejected in light of Steuer, Taylor, and US Patent Application No. 2005/0090307 ("Walker").  *See* August 23, 2016 Non-Final Rejection, ECF No. 75-4 ¶¶ 21–23.  Since claim 35 is not relevant to the claim construction dispute, the Court declines to outline the examiner's grounds for the rejection of claim 35 in detail.  Further, claims 28, 38, and 45 were rejected based on nonstatutory double patenting over U.S. Patent No. 9,240,101 (the "'101 Patent").  Skillz resolved the nonstatutory double patenting rejection by filing a terminal disclaimer against the '101 Patent.

United States District Court
Northern District of California

The Court finds that the prosecution history provides little guidance for the claim construction dispute at hand.  The sole non-final rejection in the prosecution history pertained to the "associated with" language in the preliminary claims.  The examiner found that a stream of pseudo random number seeds "associated with" a unique match identifier was obvious in light of the Taylor reference's disclosure of a system that combined a unique match identifier with a pseudo random number seed.  *See* August 23, 2016 Non-Final Rejection, ECF No. 75-4 ¶ 16.  According to the examiner, the pseudo random number seed was "associated with" the unique match identifier because the identifier was *combined with* the seed.  The pseudo random number seed was not *derived from* the unique match identifier in any way.  Since the parties' claim construction dispute relates to how a stream of pseudo random number seeds can be derived from a unique match identifier within the scope of the claims, the Court finds that the examiner's non-final rejection based on Taylor has little bearing on the present dispute.

AviaGames argues based on the prosecution history that Skillz is attempting to recapture disclaimed scope through its proposed construction.  As the Court outlined above, prosecution history disclaimer requires unambiguous disavowal.  *See Shire Pharm.*, 839 F.3d at 1119–20. AviaGames argues that the Taylor reference taught looking up a unique match identifier and combining it with a pseudo random number seed.  *See* AviaGames Suppl. Brief, ECF No. 116 at 5. Since Skillz's proposed construction would include an embodiment that involves a lookup table, AviaGames argues that Skillz is seeking to recapture disclaimed scope.  *See id.*  In support, AviaGames points to several instances during the April 29, 2022 hearing where Skillz's counsel indicated that the invention of the '564 Patent involved pseudo random number seeds that are "associated with" a particular match.  *See id.* (citing April 29, 2022 Hearing Transcript, ECF No. 116, Ex. 3 at 7:15–21; 6:12–23; 9:8–12; 9:18–23; 10:9–11; 11:4–8; 26:10–12).

The Court finds that AviaGames has not shown unambiguous disavowal of the claim scope encompassed by Skillz's proposed construction.  As outlined above, the Court finds that the prosecution history of the '564 Patent has little bearing on the current dispute—let alone the kind of clear and unambiguous disavowal required for prosecution history disclaimer.  While the examiner found that the Taylor reference taught a stream of pseudo random number seeds "associated with"

United States District Court
Northern District of California

19

a unique match identifier, it is at least ambiguous whether the Taylor reference taught a unique match identifier that is "describing or used for generating" a stream of pseudo random number seeds. AviaGames' reference to "lookup" is a stretch—there is no indication that Taylor teaches looking up pseudo random number seeds based on a unique match identifier.  Further, AviaGames' citations to the April 29, 2022 transcript have little relevance—the identified excerpts show only that Skillz's counsel indicated that pseudo random number seeds were "associated with" particular matches, not that the seeds were "associated with" a unique match identifier.  *See* April 29, 2022 Hearing Transcript, ECF No. 116, Ex. 3 at 7:15–21; 6:12–23; 9:8–12; 9:18–23; 10:9–11; 11:4–8; 26:10–12.

The Court finds that the prosecution history provides little guidance regarding the claim construction at hand—let alone the kind of unambiguous disclosures required to support prosecution history disclaimer.

### d.  Extrinsic Evidence

The Court next considers the parties' extrinsic evidence.  Extrinsic evidence—including expert and inventor testimony, dictionaries, and learned treatises—"can shed useful light on the relevant art," but "it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *See Phillips*, 415 F.3d at 1317 (citations and quotation marks omitted). The parties provide two main types of extrinsic evidence:  (1) dictionary definitions and (2) expert declarations.  The Court will consider each in turn.

### i.  Dictionary Definitions

The parties cite dictionary definitions in support of their constructions.  Courts may rely on dictionary definitions in construing claim terms "so long as [they do] not contradict any definition found in or ascertained by the reading of the patent document."  *See Vitronics Corp*, 90 F.3d at 1584 n.6.  Both parties point to the following dictionary definitions for "characterize":

- "to describe the qualities or peculiarities of" (Bombach Suppl. Decl., ECF No. 116-2, Ex. 1, American Heritage College Dictionary, 3rd Ed. (1993));
- "to describe the character or quality of," where "character," is defined as "one of the attributes or features that make up and distinguish an individual" (Bombach Suppl. Decl., ECF No. 116-2, Ex. 2, Merriam Webster's Collegiate Dictionary, 11th Ed. (2003)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   AviaGames argues that since a number can describe another number's qualities or peculiarities only

2   by becoming an intrinsic component of the other number, these dictionary definitions support

3   AviaGames' construction of "characterized by."  *See* AviaGames Suppl. Decl., ECF No. 116 at 2.

4   Skillz argues that these dictionary definitions are consistent with its construction.  *See* Skillz Suppl.

5   Brief, ECF No. 115 at 3.

6         The parties also point to *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,

7   308 F.3d 1167 (Fed. Cir. 2002), where the Federal Circuit construed the term "characterizable" in

8   the claims of a chemistry-related patent.  AviaGames points to a definition for "characterize" from

9   the Webster's Third New International Dictionary cited by the Federal Circuit in that case:  "to

10  describe the essential character or quality of . . . to be a distinguishing characteristic of."  *See Union

11  Carbide*, 308 F.3d at 1177.  Skillz points to the Federal Circuit's construction of "characterizable"

12  in *Union Carbide*—"able to be characterized or described by," *Union Carbide*, 308 F.3d at 1177—

13  arguing that it is consistent with Skillz's construction.  *See* Skillz Suppl. Brief, ECF No. 115 at 3.

14        The Court finds that the parties' dictionary definitions provide little insight regarding the

15  claim construction dispute at hand.  The fact that both parties point to two of the same dictionary

16  definitions in support of their constructions belies that the provided definitions are not particularly

17  supportive of either party's construction.  The definitions support AviaGames' construction only if

18  the Court agrees with AviaGames' assertion that one number must be an intrinsic component of

19  another number if the first number "describe[s] the character or quality" the second number.

20  Otherwise, the definitions are consistent with Skillz's construction, since the definitions themselves

21  do not contain any reference to "intrinsic component[s]."  Further, the *Union Carbide* construction

22  of "characterizable" includes the word "characterized," so it is unclear how such a construction is

23  supposed to inform the construction of "characterized by."  *See Union Carbide*, 308 F.3d at 1177.

24  Accordingly, the dictionary definitions cited by the parties leave the Court back where it started—

25  determining whether "characterize" is as limited as AviaGames' asserts it is when used to refer to a

26  relationship between numbers.

27        Based on the above reasoning, the Court finds that the dictionary definitions provided by the

28  parties provide little to no guidance on the appropriate construction for "characterized by" in the

'564 Patent claims.

### ii.    Expert Declarations

The parties provide expert declarations in support of their constructions.  Expert testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318 (citations omitted).  However, since expert testimony is "generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence," "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.*  Further, "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history[.]'" *Id.* (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).  "[R]eliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence . . . *i.e.*, when the intrinsic evidence is insufficient to enable the court to construe disputed claim terms." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).  While the intrinsic evidence provides some support for Skillz's construction over AviaGames' construction as outlined above, since the relevant intrinsic evidence is so scant, the Court finds it appropriate to consider the parties' expert declarations.  *See id.*[6]

AviaGames' expert Dr. Welch indicates that a POSITA would understand both the unique match identifier and the stream of pseudo random number seeds in the '564 Patent claims as numbers.  *See* Welch Decl., ECF No. 116-1 ¶ 30.  Since a number is a "piece of data that a computer scientist would see objectively," Dr. Welch opines that a POSITA would understand that the unique

---

[6] The parties essentially agree on the education and experience of a person of ordinary skill in the art ("POSITA").  *See* Welch Decl., ECF No. 116-1 ¶ 23; Zagal Decl., ECF No. 115-2 ¶ 24.  The Court finds that a POSITA is someone with a bachelor's degree in game design, computer science, computer engineering, or a related field, with at least two years of professional experience working in game or interactive electronic system design.  With more education, less professional experience is needed, and *vice versa*.

United States District Court
Northern District of California

match identifier must have a "deterministic and direct role in creating" a seed (*i.e.*, the identifier must be an "intrinsic component" of the seed) for the identifier to "characterize" the seed. *See id.* ¶¶ 31–32. Dr. Welch opines that a number is not "characterized" by other features, like "smell, beauty, or cost." *See id.* ¶ 31. Further, Dr. Welch opines that "characterized by" means "more than a mere association between seed and identifier." *See id.* ¶ 37. Dr. Welch additionally opines that "[w]hat makes up a seed's components" must be "readily apparent when computer code is reviewed." *See id.* ¶ 37. In response to Skillz's construction, Dr. Welch opines that the "describing" language in Skillz's construction does not make sense for numbers, since numbers cannot be "subjectively described as pleasant, beautiful, or delicious." *See id.* ¶ 34. Further, Dr. Welch opines that the "used for generating" language in Skillz's construction is "wrong" because it is ambiguous, leaving room for "someone to incorrectly think that the claims should cover general computer operation." *See id.* ¶ 35. In support of his opinions, Dr. Welch cites to the same intrinsic and extrinsic evidence cited by AviaGames in its claim construction briefing. *See id.* ¶¶ 24, 26–28, 32, 38–44.

Skillz's expert Dr. Zagal opines that a POSITA would understand based on the specification that there are different ways for a stream of pseudo random number seeds to be "characterized by" other information like a match identifier, since the '564 specification shows "different examples" of one thing "characterizing" another thing. *See* Zagal Decl., ECF No. 115-2 ¶¶ 34–44. Dr. Zagal points to the use of the word "characterizing" throughout the specification—which the Court outlined above—arguing that a POSITA would understand based on these various uses that "characterizing" could mean "describing" or "used to generate." *See id.* ¶¶ 37, 41. Dr. Zagal opines that AviaGames' construction contradicts the uses of "characterizing" in the specification and otherwise would not make sense to a POSITA. *See id.* ¶¶ 37, 42. First, Dr. Zagal opines that an "intrinsic component" of a pseudo random number seed is not commonly used terminology in the industry, and it is unclear what this language means in AviaGames' proposed construction. *See id.* ¶ 45. Second, Dr. Zagal opines that a POSITA would recognize the impracticality of AviaGames' proposed construction. For example, Dr. Zagal opines that the '564 Patent uses unique match identifiers and pseudo random number seeds to achieve "fair, yet unpredictable game play elements

United States District Court
Northern District of California

across multiple instances of the same game." *See* Zagal Decl., ECF No. 115-2 ¶ 32.  However, Dr. Zagal opines that by knowing that the stream of seeds contains the unique match identifier, users could more easily predict the seeds and gain an unfair advantage in gameplay. *See id.* ¶ 48.  Further, Dr. Zagal opines that a POSITA would recognize that a system in which the unique match identifier had to be an intrinsic component of seeds would be cumbersome, since it would impractically limit the usable values for unique match identifiers and pseudo random number seeds. *See id.* ¶¶ 49–50, 53.

The Court finds that Dr. Zagal's declaration provides support for Skillz's construction.  Dr. Zagal opines that a POSITA would understand "characterized by" consistent with Skillz's construction based on the variety of ways the word "characterizing" is used throughout the specification. *See* Zagal Decl., ECF No. 115-2 ¶¶ 34–44.  Further, Dr. Zagal opines that based on the alleged invention of the '564 as outlined at lines 14:51–15:7 of the specification—*i.e.*, that the invention "provides a solution to the problem of randomized game elements in the context of skill-based competitive games," *id.* ¶ 27—a POSITA would understand "characterized by" according to Skillz's construction, rather than AviaGames'.  In support of his opinions, Dr. Zagal points to a variety of ways in which a POSITA would consider the alleged invention of the '564 Patent to be impractical, given its purpose of providing randomized but fair gameplay, if AviaGames' construction applied. *See id.* ¶¶ 32, 45, 49–50, 53.  The Court finds Dr. Zagal's declaration compelling and amply supported by the specification.

The Court finds that Dr. Welch's expert declaration fails to provide support for AviaGames' proposed construction.  Much of Dr. Welch's expert declaration relies on the same intrinsic evidence that AviaGames relied on in its briefing. *See* Welch Decl., ECF No. 116-1 ¶¶ 24, 26–28, 32, 38–44.  For the reasons outlined above, the Court finds that the intrinsic evidence generally favors Skillz's construction and disfavors AviaGames' construction.  Otherwise, Dr. Welch's declaration is conclusory and confusing. *Phillips*, 415 F.3d at 1318.  Dr. Welch asserts without support that a POSITA would understand that the unique match identifier must have a "deterministic and direct role in the creation of [a] seed" for the seed to be "characterized by" the identifier. *See id.* ¶¶ 31, 33.  Not only is this statement conclusory—for instance, it fails to explain why a POSITA would

24

not consider an identifier with an *indirect* role in the creation of a seed to "characterize" the seed—it is confusing. What is a "deterministic and direct role," and how is it related to being an "intrinsic component"? What does it mean that a POSITA would consider a number "objectively" or able to be "objectively determined by looking at the seed within a computer's source code"? *See id.* ¶¶ 31, 33. Further, Dr. Welch opines that "a number cannot be 'characterized' by its smell, beauty, or cost." *See id.* ¶ 31. But (obviously) none of these qualities of the stream of pseudo random number seeds is at issue in the parties' dispute. Rather, what is at issue is how "directly" a unique match identifier must be involved in the generation of pseudo random number seeds in order to "characterize" those seeds. And Dr. Welch's declaration fails to clearly draw such a line. Accordingly, Dr. Welch's declaration fails to provide support for AviaGames' construction, and it underlines how confusing AviaGames' construction is likely to be for a jury.

Based on the above reasoning, the Court finds that Dr. Zagal's expert declaration provides support for Skillz's construction, and Dr. Welch's expert declaration provides little support for AviaGames' construction.

### e. Conclusion

Now that the Court has worked through all the evidence, it considers the appropriate construction for the disputed term "a stream of pseudo random number seeds characterized by a unique match identifier" in claims 1, 11, and 18 of the '564 Patent. The intrinsic evidence provides support for Skillz's construction, or at least a modified version of that construction. While the claim language and the prosecution history provide little support for either party's construction, the specification provides no basis for the "intrinsic component" limitation in AviaGames' construction and some support for the "used for generating" language in Skillz's construction. *See* '564 Patent, 14:51–15:7. The extrinsic evidence provides further support for Skillz's construction. The Court finds that whereas Skillz's expert Dr. Zagal's declaration is compelling and amply supported by the specification, AviaGames' expert Dr. Welch's declaration is conclusory and confusing. The provided dictionary definitions do not move the needle.

The Court first considers AviaGames' proposed construction: "'characterized by' in the challenged phrase means that the unique match identifier is an intrinsic component of the pseudo

1    random number seeds." The Court finds AviaGames' "intrinsic component" limitation has no basis

2    in the intrinsic evidence, and nothing but conclusory support in the declaration of Dr. Welch.

3    Accordingly, AviaGames' construction is impermissibly narrow when viewed in light of the claim

4    language, the specification, and the prosecution history. On that basis, the Court declines to adopt

5    AviaGames' construction.

6         The Court next considers Skillz's proposed construction: "a stream of pseudo random

7    number seeds wherein a unique match identifier is describing or used for generating the stream of

8    pseudo random number seeds." Outside of the arguments already discussed, AviaGames raises two

9    arguments in opposition to Skillz's construction. First, AviaGames argues that the "describing"

10   language in Skillz's proposed construction ignores the claim context. Since both the unique match

11   identifier and a pseudo random number seed are numbers, AviaGames argues that it is unclear how

12   one number can "describe" another number. *See* AviaGames Suppl. Brief, ECF No. 116 at 2–3.

13   The Court agrees with AviaGames. While the Court acknowledges that the '564 specification uses

14   "characterizing" to mean something like "describing" or "summarizing" in the specification when

15   discussing matter unrelated to the pseudo random number generation process, it is unclear how a

16   number like a unique match identifier might "describe" another number like a pseudo random

17   number seed. At the very least, no such meaning for "describe" is supported by the claim language,

18   specification, or prosecution history. Further, the term "describing" has no evident meaning or

19   boundaries and is sure to invite a battle of the experts at trial. *See Funai*, 616 F.3d at 1366.

20   Accordingly, the Court declines to adopt the "describing" language in Skillz's proposed

21   construction.

22        Ignoring the "describing" language in Skillz's construction, the Court is left with the "used

23   for generating" language. AviaGames argues that the "used for generating" language in Skillz's

24   proposed construction injects non-existent functional requirements into the claims and results in

25   ambiguity, because it provides no clear line between the alleged invention and the normal operation

26   of a computer, which commonly "generates" things and uses "identifiers." *See* AviaGames Suppl.

27   Brief, ECF No. 116 at 3. As to AviaGames' first argument, the Court previously addressed this

28   issue—"used for generating" is consistent with how the specification describes the alleged

26

invention.  *See* '564 Patent, 14:51–15:7.  AviaGames' second argument seems to be that the "used for generating" language in Skillz's construction renders the claims too broad.  The Court disagrees.  The claims do not generally discuss "identifiers" and "generating" like AviaGames asserts—they pertain to "unique match identifiers" and generating "a stream of pseudo random number seeds."  Accordingly, the Court is unconvinced that a construction using Skillz's "used for generating" language will produce the kind of ambiguity AviaGames warns about.

Based on the above reasoning, the Court hereby adopts the following construction for "a stream of pseudo random number seeds characterized by a unique match identifier:  "a stream of pseudo random number seeds wherein a unique match identifier is used for generating the stream of pseudo random number seeds."

| "a stream of pseudo random number seeds characterized by a unique match identifier" ('564 Patent, Claims 1, 11, and 18) | | |
|---|---|---|
| **Skillz's Construction** | **AviaGames' Construction** | **Court's Construction** |
| a stream of pseudo random number seeds wherein a unique match identifier is describing or used for generating the stream of pseudo random number seeds | "characterized by" in the challenged phrase means that the unique match identifier is an intrinsic component of the pseudo random number seeds | a stream of pseudo random number seeds wherein a unique match identifier is used for generating the stream of pseudo random number seeds |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

United States District Court
Northern District of California

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that the claims of the '564 Patent are

CONSTRUED as follows:

| Term | Court's Construction |
|---|---|
| "generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers" ('564 Patent, Claims 1, 11, 18) | "generating, at the client and using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers" |
| "a stream of pseudo random number seeds characterized by a unique match identifier" ('564 Patent, Claims 1, 11, and 18) | "a stream of pseudo random number seeds wherein a unique match identifier is used for generating the stream of pseudo random number seeds" |

Dated:  June 21, 2022

_____
BETH LABSON FREEMAN
United States District Judge