JENNIFER TAYLOR STEWART (SBN 298798)
jstewart@kslaw.com
**KING & SPALDING LLP**
50 California St., Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

LAZAR POL RAYNAL (*Pro Hac Vice*)
lraynal@kslaw.com
**KING & SPALDING LLP**
110 N Wacker Dr., Ste. 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330

CHRISTOPHER C. CAMPBELL (*Pro Hac Vice*)
ccampbell@kslaw.com
YUSHAN LUO (SBN 329770)
yluo@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Ave. NW Ste. 200
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-7411

BRITTON F. DAVIS *(Pro Hac Vice)*
bdavis@kslaw.com
BRIAN J. EUTERMOSER (*Pro Hac Vice*)
beutermoser@kslaw.com
ROY FALIK *(Pro Hac Vice)*
rfalik@kslaw.com
ANGELA C. TARASI (*Pro Hac Vice*)
atarasi@kslaw.com
**KING & SPALDING LLP**
1401 Lawrence St. Ste 1900
Denver, CO 80202
Telephone: (720) 535-2300
Facsimile: (720) 535-2400

MATTHEW DAVID WOOD (*Pro Hac Vice*)
mwood@kslaw.com
**KING & SPALDING LLP**
500 W 2nd St.
Austin, TX 78701
Telephone (512) 457-2000

JESSICA BENVENISTY (*Pro Hac Vice*)
jbenvenisty@kslaw.com
RAHUL SARKAR (*Pro Hac Vice*)
rsarkar@kslaw.com
**KING & SPALDING LLP**
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone: (212) 556-2100

*Attorneys for Plaintiff*
SKILLZ PLATFORM, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SKILLZ PLATFORM INC., <br><br> Plaintiff, <br><br> v. <br><br> AVIAGAMES INC., <br><br> Defendant. | Case No. 5:21-cv-02436-BLF <br><br> The Hon. Judge Beth Labson Freeman <br><br> **SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT** <br><br> **[REDACTED - PUBLIC VERSION]** |

Plaintiff Skillz Platform Inc. ("Skillz" or "Plaintiff") hereby asserts the following claim for patent infringement against Defendant AviaGames Inc. ("AviaGames" or "Defendant"), and alleges as follows:

### INTRODUCTION

1.      Most patent infringement cases involve someone who inadvertently trespassed on someone else's invention, followed by a dispute about who got there first. This is not one of those cases. Instead, it is a case where Defendant AviaGames set out, seemingly from the get-go, to steal Skillz's highly valuable intellectual property in the form of copyrights and patents. This lawsuit focuses on two of Skillz's foundational patents that AviaGames has indisputably infringed.

2.      Skillz is a pioneer in competitive mobile gaming, founded on the simple belief that people love to compete. In 2012, Skillz developed innovative technologies to invent a new kind of mobile gaming platform (the "Skillz Platform"). The Skillz Platform facilitates two important things. First, it connects millions of players across the country in meaningful, fun, and—most importantly—fair competition. Second, it enables thousands of independent mobile game developers to transform new and existing games into skill-based competitions that have proven extremely profitable for game developers and players alike. Leveraging its patented technology and collaborative business model, Skillz now hosts **billions** of casual eSports tournaments for **millions** of mobile players worldwide, offering **$100 million** in prizes each month.

3.      To help game developers enable social competition in their games and take advantage of the Skillz Platform, Skillz provides a free Software Development Kit ("SDK") through a portal on its website (the "Developer Portal"). The Skillz SDK includes, among other things, built-in, patented functionality that provides pseudo-random number generation that developers are required to use when they need a random number seed for their game. This feature ensures that players in head-to-head competition are playing under identical, yet random, conditions and is critical to the fairness of every game played on the Skillz Platform.

4.      In 2016, AviaGames met with Skillz and said it was interested in building a game for the Skillz Platform. It signed up to become a Skillz customer; and, pursuant to its written contracts with Skillz, AviaGames and began receiving additional tools, creative support, market

data, and technical know-how, beyond the services Skillz offers through its Developer Portal. Through this supposed "collaboration," AviaGames gained intimate knowledge of the Skillz Platform.

5.     AviaGames then created a copycat platform called Pocket7Games and used it to launch knockoff versions of some of the most popular games on the Skillz Platform. AviaGames even began promoting the Pocket7Games app using marketing assets that Skillz provided after AviaGames asked for help promoting the only game it did create for the Skillz Platform. That game, which flopped, appears to have been a mere decoy designed to facilitate AviaGames's access to valuable information about Skillz's technology and business.

6.     AviaGames then went on to create and release standalone games independent of its Pocket7Games app, including games titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz".

7.     Through these standalone games and the Pocket7Games platform, AviaGames now competes directly with Skillz, as well as the independent developers whose games AviaGames has slavishly copied.

8.     It may turn out that AviaGames's infringement was less deliberate than it appears— that AviaGames simply absorbed the keys to Skillz's success and then used those keys to its advantage without even knowing it.

9.     But something more sinister may have happened. Discovery in this case may establish that AviaGames planned from the get-go to merely "pose" as a mobile developer interested in launching a game on the Skillz platform, bait Skillz into divulging the ins and outs of its technology and business, and use this valuable information to deliberately infringe Skillz's intellectual property and profit from Skillz's innovation and drive.

10.    AviaGames's internal documents and the depositions of its key personnel will tell whether its infringement was innocent or not. AviaGames may have intended to deceive Skillz from the moment the parties first met in 2016. Under the patent laws of the United States, however, it makes no difference. What matters is that AviaGames is profiting from Skillz's patented technology. And that it must stop.

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT          Case No. 5:21-cv-02436-BLF

11.     Skillz welcomes fair competition. But Skillz cannot—and will not— tolerate theft. Skillz brings this action to protect its innovative technology, and to hold AviaGames accountable for its infringement of the patents that teach it.

### THE PARTIES

12.     Skillz is a Delaware corporation with its principal place of business at 321 NW Glisan Street, Suite 510, Portland, Oregon 97209. Skillz is the owner of the intellectual property rights at issue in this action. Skillz's innovative technology has enabled thousands of independent video game developers to create thriving businesses developing skill-based video games that provide millions of gamers with access to fair, fun, and meaningful competition. Because of Skillz, video gamers can now compete and profit from their skill and dedication.

13.     On information and belief, AviaGames is a Delaware corporation with a principal place of business at 2586 Wyandotte Street, Unit 2B, Mountain View, California 94043. On information and belief, AviaGames markets, offers, and distributes applications and services such as the Pocket7Games application and standalone game applications throughout the United States, including in this District.

14.     Upon information and belief, AviaGames directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells infringing products and services in the United States, including in this District, and otherwise purposefully directs infringing activities to this District in connection with the Pocket7Games application and standalone game applications.

### JURISDICTION & VENUE

15.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

16.     This Court has subject-matter jurisdiction over the matters asserted herein under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq.*

17.     This Court has personal jurisdiction over AviaGames, in part because AviaGames does continuous and systematic business in this District, including by providing infringing products and services to the residents of this District that it knew would be used within this District,

3

and by soliciting business from the residents of this District. For example, AviaGames is subject to personal jurisdiction in this Court because, among other reasons, upon information and belief, it has a regular and established place of business at its offices in this District, including its office in Mountain View, and directly and through agents regularly does, solicits and transacts business in the Northern District of California and elsewhere in the State of California, including through its website at www.pocket7games.com, as well as its Pocket7Games application and standalone game applications, all of which are marketed, offered, distributed to, and utilized by users of mobile devices in this District and throughout the State of California.

18.     In particular, AviaGames has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, sold, and/or imported infringing products and services in the State of California, including in this District, and engaged in infringing conduct within and directed at or from this District. For example, AviaGames has purposefully and voluntarily placed the Pocket7Games application and standalone game applications into the stream of commerce with the expectation that its infringing products and services will be used in this District. The infringing Pocket7Games application and standalone game applications have been and continue to be distributed to and used in this District. AviaGames's acts cause injury to Skillz, including within this District.

19.     Venue is proper in this District under the provisions of 28 U.S.C. §§ 1391 and 1400(b) at least because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because AviaGames has committed acts of infringement in this District and has a regular and established place of business in this District.

20.     In particular, on information and belief, AviaGames has a regular and established place of business in this District located in Mountain View, California. On further information and belief, AviaGames employs engineers and/or other personnel within this District, including at its office in Mountain View.[1]

---

[1] For example, www.linkedin.com identifies AviaGames's founder and CEO, Vickie Chen, and AviaGames's co-founder and VP of Marketing, Ping Wang, as being located in Mountain View, California. (*See* Exs. C & D.) In addition, as of the date of this filing, AviaGames's LinkedIn page includes a job posting for a full- time position in the "San Francisco bay area." (*See* Ex. E.)

**INTRADISTRICT ASSIGNMENT**

21.     On information and belief, a substantial part of the events giving rise to the claims alleged in this Complaint occurred in the County of Santa Clara. For purposes of intradistrict assignment under Civil Local Rules 3-2(c) and 3-5(b), this Intellectual Property Action will be assigned on a districtwide basis.

**FACTUAL ALLEGATIONS**

**I.     SKILLZ'S INNOVATION GIVES BIRTH TO A THRIVING NEW INDUSTRY**

22.     Skillz was founded in October 2012 in Boston, Massachusetts.

23.     At that time, despite the popularity of video games in modern society, video gamers had limited to no options to compete and profit from their skill and dedication in the same way that athletes in many physical sports could. While athletes in physical sports could earn millions of dollars through competition—not to mention recognition, respect, endorsements, and countless other opportunities— the technology to afford video gamers similar opportunities hadn't yet been developed. Andrew Paradise and Casey Chafkin founded Skillz to change that. Skillz now offers more than $100 million in prizes each month.

24.     Skillz makes a mobile eSports platform. Rather than hoard its technology, Skillz opened the platform to third-party game developers to maximize the impact and reach of its innovation.

25.     The Skillz Platform helps developers build successful franchises by enabling social competition in their games. Not only that, it aligns the interests of developers and gamers with respect to user monetization. Whereas traditional mobile games monetize user engagement through in-game advertisements or purchases, the Skillz Platform allows developers to monetize user engagement primarily through prizes and competition. This dynamic generates significantly stronger monetization for developers while delivering gaming experiences that players trust and love. In turn, Skillz receives a percentage of player entry fees in paid contests.

26.     To enable game developers to make their games available on the Skillz Platform, Skillz developed a Software Development Kit ("SDK") that allows developers to integrate eSports functionality and social competition into new or existing mobile games. Using Skillz's SDK,

5

which Skillz makes available through a portal on its website, game developers can create or modify their own video games to be fun, fair, and competitive experiences.

27.     Competitive gaming has proven to improve player retention, enhance gameplay, boost app store reviews, increase player engagement, and lengthen gameplay sessions—all of which helps game developers better monetize their content. Thus, integrating Skillz's patented technology has proven extremely valuable to game developers, in addition to the users that play these games.

28.     To create the Skillz Platform, Skillz developed several groundbreaking technologies, including the two patents that are the subject of this action.

29.     To guarantee the fairness and integrity of every competition on the Skillz Platform, Skillz developed a technology that allows gameplay to be the same for competitors within an online digital game competition, while also allowing games to be different across different competitions. By assigning each competition a unique match identifier and using pseudo-random number seeds that are characterized by that unique match identifier, the elements of each game can be the same for the participants in one competition while maintaining the unpredictable nature of each game that is critical to competitive gaming. This novel technology allows competitions to be skill-based even when the games have random elements associated with them, such as the starting hand and deck in a head-to-head game of solitaire. Game developers are instructed on how to access this technology through the Skillz SDK so that their games can offer head-to-head competitions where gamers experience identical, yet still unpredictable, conditions. Skillz has been awarded multiple patents relating to this technology, including U.S. Patent No. 9,649,564 ("the '564 Patent"). ECF No. 1-2.

30.     The '564 Patent is fundamental to the innovation that Skillz brought to the mobile gaming industry. Using the technology, Skillz enables video game developers to create skill-based mobile video games for the Skillz Platform in which users can compete with one another to earn hundreds, thousands, or even millions of dollars.

6

## II.     LED BY SKILLZ, THE "ESPORTS" INDUSTRY EXPLODES

31.     Fueled in part by Skillz's revolutionizing technology and collaborative business model, the eSports industry exploded, and Skillz became one of the fastest growing companies in the United States.

32.     Although Skillz did not coin the term "eSports" or invent the concept of mobile gaming or competitive video games, Skillz's technology and drive has had an enormous impact on these industries and has helped launch eSports into the mainstream. Though Skillz's impact cannot be quantified in numbers alone, the numbers themselves are staggering.

33.     The first Skillz-powered gaming app went live in April 2013. By July 2014, Skillz had paid out over $1 million in cumulative prize money. By June 2015, that number had increased to $10 million. In December 2015, it reached $20 million.

34.     In January 2016, Skillz launched cross-platform multiplayer technology allowing Android and iOS users to play in the same competitive video game tournaments. That year, Skillz accounted for 46% of *all* eSports prizes awarded.

35.     In May 2017, Skillz became the first eSports company to appear on CNBC's "Disruptor 50" list after it doubled its revenue run-rate to over $100 million in eight months.

36.     In August 2017, Skillz was named the fastest growing private company in America by *Inc.* magazine, with three-year revenue growth of over 50,000%.

37.     By October 2017, just four years after its founding, Skillz had over 6,000 independent developers signed up to create games and eSports for the Skillz Platform.

38.     In November 2017, Skillz launched multi-app chat technology, allowing more than 2,500 apps on the Skillz Platform to connect 12 million users through chat.

39.     Today, the Skillz Platform has over 40 million registered users and hosts an average of over 5 million daily tournaments, including 1.5 million paid entry daily tournaments, offering over ***$100 million*** in prizes each month.

40.     And, contrary to certain stereotypes about competitive sports and video gamers, more than half of Skillz's 40 million players are women. In 2018, the top ten gamers on the Skillz Platform received $8 million in prize money. Seven of those competitors were women—including

a user named Kmamba1090, who received $1,418,508 in prize money that year, and a user named jpark87, an engineering student whose $627,191 in prize money helped her pay for college.

41.     In the wake of Skillz's revolutionary advancements, mobile gaming has attracted billions of dollars of investment from traditional sports teams and leagues, professional athletes, pop stars, private equity, media moguls, Fortune 100 corporations, and a diverse array of game publishers.

42.     Skillz's meteoric rise has fueled the growth of an industry whose market size already eclipses music, movies, and television.

43.     Yet Skillz is not alone in its success, nor did it set out to be. Skillz's mission today is the same as it has been from the start: to enable independent mobile game developers to create thriving businesses while providing gamers everywhere with access to fair, fun, and meaningful competition. By sharing its technology with game developers in this collaborative manner, Skillz has created opportunities for thousands of independent start-ups. Skillz's technology provides the tools necessary for mom-and-pop development studios to compete with the largest and most sophisticated mobile game developers in the world.

### III.   AVIAGAMES TEAMS UP WITH SKILLZ TO DEVELOP A GAME FOR THE SKILLZ PLATFORM—OR SO IT SAYS

44.     In 2016, AviaGames began inquiring about the Skillz Platform.

45.     Without Skillz's know-how and SDK, developers could spend years trying to overhaul their video games into eSport games. The Skillz SDK enables developers to achieve that transformation in as little as a single day of development work. This technology set is delivered to Skillz's game development community via Skillz's Developer Portal, which allows registered developers to monitor, integrate and update their games on the Skillz Platform seamlessly.

46.     The ability to transform regular video games into competitive eSports has proven extremely valuable to independent game developers, allowing them to turn many of their games into revenue sources that reward both developers and users alike.

47.     In particular, Skillz's Tournament Management System ("TMS") drives revenue for game developers by enabling cash tournaments, increasing traffic, advertising revenue, and in-

app purchases through virtual currency tournaments. The Skillz TMS also improves game retention. Competition makes games more social as players compete against each other in tournaments. Scores become more meaningful as players get rewarded for their skills, which translates into more downloads, a higher number of daily active users, and longer gameplay sessions.

48.     While any game developer can make authorized use of Skillz's SDK by going to www.Skillz.com, creating an account on the Skillz Developer Portal, and agreeing to Skillz's standard Online Developer Terms and Conditions of Service, developers could choose to negotiate bespoke terms and conditions, or seek additional services from Skillz.

49.     AviaGames became a Skillz developer-customer in 2016 so that it could benefit from Skillz's technology and specialized knowledge and expertise.

50.     Armed with the knowledge it learned from Skillz, the Pocket7Games platform includes several games that are blatant copies of games already offered on the Skillz Platform.

51.     AviaGames later released several of these copycat games as standalone games, further infringing Skillz's inventions.

52.     AviaGames's wrongful appropriation of Skillz's technology and innovation continues to this day, allowing AviaGames to continue profiting off of the work of others.

53.     Skillz brings this action to protect its innovative technology, hold AviaGames accountable for its unlawful infringement, and recoup the damages it has suffered—and the profits AviaGames has "earned"—as a result of AviaGames's misconduct.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,649,564

54.     Skillz incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

## THE '564 PATENT

55.     U.S. Patent No. 9,649,564 ("the '564 Patent") is entitled "Peer-to-peer wagering platform," and was issued on May 16, 2017. A true and correct copy of the '564 Patent is attached as Exhibit B.

56.     The '564 Patent was filed on December 21, 2015, as U.S. Patent Application No. 14/976,569 and claims priority to, *inter alia*, U.S. Patent Application No. 13/569,424, filed on August 8, 2012.

57.     Skillz is the owner of all rights, title, and interest in and to the '564 Patent, with the full and exclusive right to bring suit to enforce the '564 Patent, including the right to recover for past infringement.

58.     The '564 Patent is valid and enforceable under United States Patent Laws.

59.     The transmission of pseudo-random numbers, characterized by a unique match identifier, to clients participating in an online digital gaming competition, and the use of those pseudo-random numbers to generate a common gameplay experience for a game of skill, especially one having random elements, was not well known in the art as of the priority date of the '564 Patent.

60.     The inventors of the '564 Patent recognized that an expansion of computer networks and a corresponding expansion of online digital gaming created new opportunities for games of skill, including games of skill having random elements. They recognized that many games use random numbers to determine game elements and properties, and determined that online games of skill which are inherently competitive could benefit from a common gameplay experience that standardizes those random elements. '564 Patent at 14:51-60 ("Since random numbers are typically used in gameplay engines to decide game elements and properties (e.g., what obstacles are present can be decided based on the value that a random number generator returns), the use of common random numbers can provide a common gameplay experience to a subset of users (e.g., the players involved in a third party game tournament). The common gameplay experience can be used to standardize (or level the playing field) for a game of skill that still has random elements."). To realize this improvement, the inventors conceived of an improvement to the operation of the computer system which is embodied in the claims of the '564 Patent that "caus[es] gameplay to be different between tournaments, but not between game instances in a given tournament." '564 Patent at 15:5-7.

61.   The '564 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of online digital games. The solution implemented by the '564 Patent provides a specific and substantial improvement over prior ways of running online digital games that would not provide a common experience to all participants, resulting in an improved method for facilitating fair, skill-based online digital games, including games having random elements. The '564 Patent achieves this result by introducing novel elements such as, among other things, receiving a stream of pseudo random number seeds characterized by a unique match identifier, using this stream to generate a plurality of pseudo-random numbers, and executing the game instance by the client and using those pseudo-random numbers to provide an online competition where a beginning of gameplay experience is common between at least two clients.

62.   The claims of the '564 Patent recite and embody Skillz's innovative, unconventional solution to the problem of providing a common experience to all participants in an online digital game competition, including one having random elements. For example, claim 1 recites "[a] method comprising: receiving, at a client including an executable game instance, a stream of pseudo random number seeds characterized by a unique match identifier for an online digital gaming competition, the client enrolled in the online competition; receiving, at the client and from a game server, game data for executing the game instance, the game instance requiring one or more random numbers to complete execution of the game instance; generating, using the stream of pseudo-random number seeds, a plurality of pseudo- random numbers; and executing the game instance by the client and using the plurality of pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition; wherein at least one of receiving, generating, and executing is implemented by at least one data processor forming part of at least one computing system." '564 Patent at claim 1.

63.   The '564 Patent further claims "[t]he method of claim 1, wherein the game instance provides a game of skill having random elements." '564 Patent at claim 3.

1

## '564 PATENT ALLEGATIONS

2   64.    AviaGames has infringed and is infringing, either literally or under the doctrine of

3   equivalents, the '564 Patent in violation of 35 U.S.C. § 271 *et seq*., directly by making, using,

4   selling, offering for sale, and/or importing into the United States without authority or license, the

5   Pocket7Games application and standalone game applications, including applications titled "Bingo

6   Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated backend

7   servers and systems (hereinafter "the Accused Products") that infringe at least claim 1 of the '564

8   Patent. The Accused Products are non-limiting examples identified based on publicly available

9   information, and Skillz reserves the right to identify additional infringing activities, products and

10  services, including, for example, on the basis of information obtained during discovery.

11  65.    On information and belief after reasonable investigation, the '564 Accused

12  Products include the Pocket7Games application and standalone game applications, including

13  applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz",

14  and associated game servers.

15  66.    As just one non-limiting example, set forth below (with claim language in italics)

16  is a description of infringement of exemplary claims 1 and 3 of the '564 Patent in connection with

17  the Pocket7Games application and standalone game applications, including applications titled

18  "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and associated

19  backend servers and systems. This description is based on publicly available information. Skillz

20  reserves the right to modify this description including, for example, on the basis of information

21  about the Accused Products that it obtains during discovery.

22  *1(a) A method comprising:* - AviaGames makes and/or uses the Pocket7Games application

23  and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash",

24  "21 Gold", "Explodocube", and "Tile Blitz", and associated backend servers and systems.

25  Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the

26  claim language is met by the Accused Products, as the Accused Products perform a method as

27  further described below for the remaining claim limitations.

28

1(b) receiving, at a client including an executable game instance, a stream of pseudo random number seeds characterized by a unique match identifier for an online digital gaming competition, the client enrolled in the online competition; - For example, on information and belief, the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", which is an executable game instance running on an iOS client, receive a stream of pseudo random number seeds. On information and belief, the stream of pseudo-random number seeds received by the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", is characterized by a unique match identifier for an online digital gaming competition in which the client is enrolled (such as a competition of Solitaire!).





SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT          Case No. 5:21-cv-02436-BLF

*1(c) receiving, at the client and from a game server, game data for executing the game instance, the game instance requiring one or more random numbers to complete execution of the game instance;* – For example, on information and belief, the game instances which run on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", require one or more random numbers. The games available on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", include games with random and semi-random elements (such as Solitaire!), which necessitate the use of random numbers to complete execution of the game instance. On information and belief, the game instances which run on the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", require receiving game data for executing the game instance at the client and from a game server, as they cannot be played without a connection to the Internet.



*1(d) generating, using the stream of pseudo-random number seeds, a plurality of pseudo-random numbers; and -* For example, on information and belief, the stream of pseudo-random number seeds is used to generate a plurality of pseudo- random numbers that can be used to decide game elements and properties (such as the starting hand and deck of a game of Solitaire!).

*1(e) executing the game instance by the client and using the plurality of pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition; -* For example, on information and belief, the iOS client executes the game instances that run within the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz". On information and belief, those game instances use the pseudo-random numbers to provide the online competition to a player such that a beginning of gameplay experience (such as the starting hand and deck of a game of Solitaire!) is common between the game instance and a second game instance executing on a second client enrolled in the online digital gaming competition.

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT          Case No. 5:21-cv-02436-BLF

(https://www.facebook.com/Pocket7Games/posts/2207533026058051.)

*1(f) wherein at least one of receiving, generating, and executing is implemented by at least one data processor forming part of at least one computing system.* - For example, on information and belief, the Pocket7Games application or a standalone game application, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", that performs the receiving, generating, and executing steps outlined above runs on an iOS device, which is a computing system that executes the application on at least one data processor.

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT            Case No. 5:21-cv-02436-BLF



*3 The method of claim 1, wherein the game instance provides a game of skill having random elements* - On information and belief, as detailed above, the Accused Products perform the method of claim 1. In addition, for example and on information and belief, the game instance provides a game of skill having random elements (such as Solitaire!).



17

> TONS OF FUN GAMES FOR REAL MONEY
>
> Bingo Clash: Play classic Bingo games with fun buffs. Beat your opponent in fast-paced Bingo games and daub the numbers as quickly as possible to earn money in cash games.
>
> Solitaire!: A fun new take on a classic card game. Test your Solitaire skill against opponents and make money at the same time.
>
> 21 Gold: A lightning-fast version of Blackjack. If you're a fan of math games, show off your skill in this classic casino card game.

(Description of Pocket7Games in the Apple App Store.)

67.     Skillz has been damaged by AviaGames's infringement of the '564 Patent and will continue to be damaged unless AviaGames is enjoined by this Court. Skillz has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Skillz, and public interest is not disserved by an injunction.

68.     On information and belief, AviaGames markets, offers, and distributes the infringing Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", in and within the United States, including through distribution platforms such as the Apple App Store as well as its own website, www.pocket7games.com.

69.     On information and belief, the accused Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", are the primary or only products and services offered by AviaGames in the United States.

70.     On information and belief, AviaGames has also designed, developed, tested, and used the infringing applications and services in and within the United States.

71.     Skillz is entitled to recover from AviaGames all damages that Skillz has sustained as a result of AviaGames's infringement of the '564 Patent, including without limitation lost profits and not less than a reasonable royalty.

72.     Moreover, AviaGames's infringement was and continues to be willful. The discovery produced to date and the testimony of AviaGames's witnesses show that ████████ ██████████████████████████████████████████████████████████████████ ██████████████████████ At least since the filing of the Complaint, AviaGames has been aware of the '564 Patent and is continuing to engage in willful, intentional, and deliberate infringement of the '564 Patent.

73.     AviaGames knew or should have known of its infringement because AviaGames has the technical expertise to understand the scope and content of the '564 Patent, and because AviaGames knows the design, function, and operation of its Accused Products, as well as the nature and extent of the functioning of the underlying code that supports the Accused Products.

74.     For example, AviaGames alleges that ████████████████████████████ █████████████████████ See Ex. 1, Chen Dep. Tr. 61:6-24 ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████; *see also* Ex. 2, AviaGames's Fourth Supplemental Response to Skillz's Interrogatory at 12 ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████. However, ████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████ Despite this knowledge AviaGames took no action to investigate or cure its infringement and thus at least willfully blind to its infringement.

75.     Even if AviaGames did not know about the '564 Patent prior to this lawsuit, it was at least willfully blind to the existence of the '564 Patent and its infringement. Prior to releasing its infringing products to compete against Skillz, for example, Vickie Chen testified that

19

1   AviaGames

2   Ex. 1 at 120:9-25; *see also id.* at

3   165:11-166:9

4

5

6

7

8

9

10   .

11   76.

12   *See id.* at

13   167:17-24

14

15   . AviaGames was, or should have been, aware

16   of a high risk of infringement.

17   77.   AviaGames's willful blindness to Skillz's patents is even more striking in light of

18

19   Unknown to Skillz at the time AviaGames was a Skillz

20   developer-customer,

21   Ex. 3. Vickie Chen, the

22   CEO and Founder of AviaGames, confirmed in her deposition that

23   *See* Ex. 1 at 120:3-8

24

25

26

27   78.   AviaGames then allegedly

28   to create its copycat platform called Pocket7Games. *See* Ex. 2 at 6

1  ████████████████████████████████████████████████

2  ███████████████████████████ at 11–12 ███████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ███████████████████████████ ; at 47 ████████████████

6  ████████████████████████████ .

7      79. ████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████ *See* Ex. 1 at 170:13-171:22.

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ██████ *See* Ex. 3.

14     80.    Even after the service of the Complaint in this action on April 5, 2021, ECF No. 1,

15 AviaGames continued to deliberately infringe the '564 Patent. ████████████

16 ███████████████████████████████ yet Peng Zhang, AviaGames's Vice

17 President of Technology, testified that ████████████████████████████

18 ██████ *See* Ex. 4, Zhang Dep. Tr. 97:19-98:2 ████████████████████

19 ████████████████████████████████████████████ █

20 ████████████████████████ despite the service of the Complaint in this action (ECF No.

21 1), issuance of the Court's Claim Construction Order rejecting AviaGames's improper attempt to

22 narrower the scope of the '564 Patent (ECF No. 117), and the service of Skillz's Amended

23 Infringement Contentions on December 17, 2021. *See* Ex. 4 at 102:24-104 ██████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ██ .

27     81.    Rather than cease its use of Skillz's technology, AviaGames continues to plow

28 ahead with its infringement despite this lawsuit. AviaGames's unwillingness to modify the

Accused Platform, even after Skillz notified it of the details of its infringement, constitutes egregious, intentional, and deliberate infringement of the '564 Patent.

82.     Avia also intentionally and willfully used Skillz's patented technology to harm Avia's own customers as well as its competitor, Skillz. For example, Avia used Skillz's patented technology to implement "robots" (or "bots") posing as real users. Avia used these infringing bots to defraud Avia's own customers and boost its own profits in order to gain an advantage in competing with Skillz and ultimately drive Skillz out of business.

83.     Skillz's invention provides a common gameplay experience and a level playing field for skill-based games. Rather than using this invention to create a fair and equal gameplay experience for its users, Avia also uses Skillz's invention to cheat its users by matching them with bots.

84.     Avia creates artificial users or bots from previously generated gameplay experiences. Because these bots use pre-generated gameplay, Avia must ensure that a user is faced with an identical game scenario to the one in the prior gameplay experience. To achieve this, Avia uses Skillz's invention to provide the same pseudo-random number seeds (and hence identical playing conditions) to the user as were used to generate the bot gameplay, resulting in Avia directly infringing every time these bots are used.

85.     By providing the same pseudo-random number seeds to generate the same gameplay experience as selected for the bot, Avia is able to trick users into thinking that they are playing against another human user of similar skill in real time. In reality, when a user is matched with a bot, the human user is competing against a predetermined score of Avia's choosing. When a bot wins a match against a user, Avia keeps both the user's entry fee and the cash prize made available for the match.

86.     Avia's method of matching bots with users not only infringes the '564 Patent, it depends on it. Without the '564 Patent, Avia would be unable to generate a common gameplay experience between the user and the bot.

87.     Avia used its infringing bots to harm its own users. Avia was aware that it generated more revenue—at its users' expenses—by keeping entry fees and cash prizes from matches that

users lost against bots. Avia intended this outcome. Avia also believed and intended that its use of bots would provide it a competitive advantage over competitors like Skillz. Avia believed that Skillz's  failure to use bots would drive Skillz out of business.

88.     Avia has gone to great lengths to conceal its infringing use of bots and by extension its infringement of the '564 Patent. Avia lies about its bot use to its customers. In response to user complaints, Avia regularly assures users that they are playing against real people, not bots.

89.     Avia lies about its infringing use of bots to financial institutions. Federal law prohibits financial institutions from doing business with illegal gambling operations. To secure access to financial institutions, Avia provides legal opinions stating that Avia offers skill-based gaming that is permissible under the laws of the jurisdictions in which it operates. These legal opinions contain factual representations from Avia, including that in its cash games the cash prize at stake is guaranteed to be paid out to a user and is not kept by Avia. This is false. When a bot wins a cash game, the cash prize is not paid out to a user but is instead kept by Avia.

90.     Avia also took steps to hide its infringing use of bots within the company itself, including by withholding this information from its own employees and, on information and belief, from members of its board of directors and investors.

91.     Avia also attempted to conceal its infringing use of bots during this litigation. Avia CEO Vickie Chen and Avia VP Jamie Leung each denied under oath that Avia uses bots. Avia VP Peng Zhang testified under oath that if a user could not find another user to match with, the user would wait indefinitely. Mr. Zhang later admitted that if a user waits too long, that user will be matched with pre-generated gameplay, i.e., a bot.

92.     Avia's deliberate copying of Skillz's patented technology, Avia's use of bots that infringe Skillz's patented technology to harm its customers and Skillz, and Avia's efforts to conceal this infringing use, including by lying during this litigation, all constitute willful infringement of the '564 Patent.

### PRAYER FOR RELIEF

WHEREFORE, Skillz respectfully requests:

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT          Case No. 5:21-cv-02436-BLF

A.      That Judgment be entered that AviaGames has directly infringed one or more claims of the '564 Patent, directly and/or indirectly, literally and/or under the doctrine of equivalents;

B.      That Judgment be entered that AviaGames has willfully infringed the '564 Patent, and treble damages assessed;

C.      That, in accordance with 35 U.S.C. § 283, AviaGames and all its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with it, be enjoined from (1) infringing the '564 Patent and (2) making, using, selling, and offering for sale the Pocket7Games application and standalone game applications, including applications titled "Bingo Clash", "Solitaire Clash", "21 Gold", "Explodocube", and "Tile Blitz", and/or backend servers and systems enabling the accused functionality of such applications;

D.      An order directing AviaGames to file with the Court and serve upon Skillz's counsel within thirty (30) days after entry of the order of injunction, a report setting forth the manner and form in which AviaGames has complied with the injunction, including the provision relating to destruction and recall of infringing products and materials;

E.      An award of damages sufficient to compensate Skillz for AviaGames's infringement under 35 U.S.C. § 284;

F.      An enhanced award of damages to compensate Skillz for AviaGames's willful infringement under 35 U.S.C. § 284;

G.      Costs and expenses in this action;

H.      An award of prejudgment and post-judgment interest; and

I.      Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Skillz hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: November 8, 2023

/s/ *Christopher C. Cambpell*
Christopher C. Campbell

*Attorney for Plaintiff*
SKILLZ PLATFORM, INC.

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT          Case No. 5:21-cv-02436-BLF